OPINION
SMITH, Circuit Judge.
Robert Zimmerman was riding his motorcycle on a summer evening in 2008. He approached a railroad crossing, but it was dark and a building obscured the tracks. When he was less than seventy-six feet away, he noticed that a train was approaching. He tried to stop, but his front brake locked and he flew over the handlebars, colliding headfirst with a locomotive. The collision left him partially paralyzed. He sued Norfolk Southern Corporation in federal court, asserting three state tort claims.[1]
Railroads are among the most heavily regulated American industries. Unfortunately for Zimmerman, many of these regulations preempt state tort claims. The Federal Railroad Safety Act (“FRSA”) contains a provision that outlines the scope of preemption. 49 U.S.C. § 20106. The District Court for the Eastern District of Pennsylvania relied on this provision in granting summary judgment for Norfolk Southern, concluding that most of Zimmerman’s claims were preempted. We will reverse in part and affirm in part.
I
Diller Avenue is a two-lane road that runs diagonally through New Holland, *175 Pennsylvania. In the southern part of town, Diller Avenue intersects a railroad track owned and operated by Norfolk Southern. Because of the location of a tavern northwest of the crossing, southbound motorists have a difficult time seeing eastbound trains. For example, a motorist who is seventy-six feet away can see only sixty-five feet down the tracks. The speed limit on Diller Avenue is thirty-five miles per hour, while the speed limit on the tracks is subject to some disagreement. Norfolk Southern argues that the limit is at least twenty-five and maybe forty miles per hour, but Zimmerman argues that it is ten miles per hour.
The Diller Avenue crossing has been the scene of a number of accidents over the years. Five accidents were reported at the crossing in the 1970s. A decade later, the Commonwealth of Pennsylvania and the crossing’s former owner installed two white railroad-crossing signs, called cross-bucks, with the use of federal funds. Since the installation of these signs, five more accidents have been reported. At the time of Zimmerman’s accident, there was a crossbuck fixed on each side of the track; there was also a yellow warning sign on Diller Avenue, 150 feet north of the crossing, together with painted warnings on the street. Zimmerman contends that these warnings had fallen into disrepair — tree branches covered the signs on the north side and the street markings had faded.
On June 12, 2008, Zimmerman celebrated his thirty-eighth birthday. After a game of church softball and a trip to his mother’s house, he headed for home on his motorcycle. It was dark, and Zimmerman was wearing a helmet and riding within the speed limit. He turned south onto Diller Avenue and approached the crossing — a crossing he did not believe was still active. Meanwhile, an eastbound Norfolk Southern train consisting of only two engines approached the crossing travelling twenty-four miles per hour. It sounded its horn.
Zimmerman apparently failed to notice that the train was about to enter the crossing until he was less than seventy-six feet away.[2] At that point, he was too close to the track to stop.[3] One of the train operators noticed Zimmerman around this time but could not stop the train soon enough to avoid the collision. Zimmerman aggressively applied the brake of his motorcycle, causing the front wheel to lock. He flipped over the handlebar and flew headfirst into the gas tank of the lead engine. The collision left him partially paralyzed.
Zimmerman sued Norfolk Southern in the Eastern District of Pennsylvania under Pennsylvania tort law. His complaint listed four counts: failure to warn; failure to maintain a safe crossing; failure to ensure that the crossing devices complied with federal regulations; and punitive damages. On August 17, 2011, the District Court granted Norfolk Southern’s motion for summary judgment, concluding that some of Zimmerman’s claims were preempted and that others did not create a genuine issue of material fact.
Zimmerman filed a timely notice of appeal.[4] We exercise plenary review over *176 the District Court’s decision to grant a motion for summary judgment. Orvosh v. Program of Grp. Ins. for Salaried Emps. of Volkswagen of Am., 222 F.3d 123, 129 (3d Cir.2000). We construe the evidence in the light most favorable to Zimmerman, Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and we affirm “if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law,” Fed.R.Civ.P. 56(a). A “genuine dispute” exists if a reasonable jury could find for the nonmoving party. Fakete v. Aetna, Inc., 308 F.3d 335, 337 (3d Cir. 2002).
II
The doctrine of preemption permeates Zimmerman’s appeal. Norfolk Southern argues that various federal regulations preempt Zimmerman’s claims under the FRSA preemption provision. 49 U.S.C. § 20106. We have interpreted the provision a few times over the years, but Congress changed it in 2007. We begin our discussion by providing a framework for analyzing preemption under the amended FRSA. We do so because we have yet to interpret the amendment and because this analysis is relevant to each of Zimmerman’s claims. We then turn to those claims.
The Supremacy Clause of the United States Constitution is the source of preemption. U.S. Const, art. VI, cl. 2. Under the Supremacy Clause, federal law trumps or preempts state law whenever the two are in conflict. Preemption can be express or implied — either way, the effect is the same: preemption renders the relevant state law invalid. See Gade v. Nat’l Solid Wastes Mgmt. Ass’n, 505 U.S. 88, 98, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992); Holk v. Snapple Beverage Corp., 575 F.3d 329, 334 (3d Cir.2009) (recognizing that implied preemption comes in two varieties: field preemption and conflict preemption). We tend to interpret federal statutes in a way that avoids implied preemption. Holk, 575 F.3d at 334 (citing Bates v. Dow Agrosciences LLC, 544 U.S. 431, 449, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005)). The same is not true of express preemption.
Here, the FRSA expressly preempts state railroad law. Subsection (a) outlines the scope of FRSA preemption: “Laws, regulations, and orders related to railroad safety ... shall be nationally uniform to the extent practicable.” 49 U.S.C. § 20106(a)(1). Yet the FRSA does not preempt all state railroad law: “A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation ... prescribes a regulation or issues an order covering the subject matter of the State requirement.” Id § 20106(a)(2). Moreover, states may adopt a “more stringent law” if it is necessary to eliminate a “local safety or security hazard.” Id. § 20106(a)(2)(A). As the Supreme Court has noted, the FRSA “displays considerable solicitude for state law.” CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 665, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993); see also Norfolk S. Ry. Co. v. Shanklin, 529 U.S. 344, 352-54, 120 S.Ct. 1467, 146 L.Ed.2d 374 (2000).
Before the 2007 amendment, we held that a federal regulation preempts state law under subsection (a) if the regulation “substantially subsume[s] the subject matter of the relevant state law.” Strozyk v. Norfolk S. Corp., 358 F.3d 268, 271 (3d Cir.2004) (quoting Easterwood, 507 U.S. at 664, 113 S.Ct. 1732) (quotation marks omitted). The regulation must do more than simply “touch upon or relate to [the] subject matter” of the state law. Id. at 273 (quoting Easterwood, 507 U.S. at 664, 113 *177 S.Ct. 1732) (internal quotation marks omitted).
Congress amended the FRSA preemption provision in 2007 by adding subsection (b), which is a “[c]larification regarding State law causes of action”:
(1) Nothing in this section shall be construed to preempt an action under State law seeking damages for personal injury, death, or property damage alleging that a party—
(A) has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation ... or the Secretary of Homeland Security ..., covering the subject matter as provided in subsection (a) of this section;
(B) has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by either of the Secretaries; or
(C) has failed to comply with a State law, regulation, or order that is not incompatible with subsection (a)(2).
49 U.S.C. § 20106(b)(1).
The question before us is how to interpret the FRSA preemption provision in light of the 2007 amendment. Zimmerman argues that the amendment restricts the scope of preemption and thus supersedes all prior cases interpreting subsection (a), including our decision in Strozyk and the Supreme Court’s decisions in Shanklin and Easterwood. Norfolk Southern agrees that the amendment restricts preemption in some respects but argues that it preserves cases interpreting the phrase “covering the subject matter of the State requirement.” Id. § 20106(a)(2). We agree with Norfolk Southern’s interpretation.
Statutory interpretation requires that we begin with a careful reading of the text. See Bruesewitz v. Wyeth Inc., 561 F.3d 233, 244 (3d Cir.2009) (noting that this Court “decline[s] to employ legislative history if a statute is clear on its face”); Hay Grp., Inc. v. E.B.S. Acquisition Corp., 360 F.3d 404, 406 (3d Cir.2004). The scope of the amendment is clear from the text: it clarifies that claimants can avoid preemption by alleging a violation of either a “Federal standard of care” or the railroad’s “own plan, rule, or standard that it created pursuant to a regulation or order.” 49 U.S.C. § 20106(b)(l)(A)-(B). The amendment otherwise preserves the analysis for deciding whether a regulation preempts state law.
For starters, the amendment did not change the language of subsection (a). Federal regulations still preempt state law if they “cover[] the subject matter.” Id. § 20106(a)(2). The continued use of this language indicates that the analysis remains the same. In fact, the amendment explicitly preserves the right to seek damages for violating state law, as long as the law is compatible with subsection (a)(2). See id. § 20106(b)(1)(C). Moreover, the title of the new subsection (b) is “Clarification regarding State law causes of action.” The word “clarification” suggests that the amendment attempted to resolve an ambiguity rather than change substantive law. See Henning v. Union Pac. R.R. Co., 530 F.3d 1206, 1216 (10th Cir.2008) (“[T]he [title] ... indicates Congress sought to resolve an ambiguity rather than effect a substantive change.”). The amendment thus preserves cases such as Strozyk and Shanklin that analyzed whether a regulation covers state law. The amendment is significant for a different reason: it clarifies that even when a regulation covers the subject matter of a claim, the claim can avoid preemption if the railroad violated a federal standard of care or its internal rule. See 49 U.S.C. § 20106(b)(l)(A)-(B).[5]
*178 We therefore conclude that the preemption analysis under the amended FRSA requires a two-step process. We first ask whether the defendant allegedly violated either a federal standard of care or an internal rule that was created pursuant to a federal regulation. If so, the plaintiff’s claim avoids preemption. See 49 U.S.C. § 20106(b)(l)(A)-(B). Otherwise, we move to the second step and ask whether any federal regulation covers the plaintiffs claim. See id. § 20106(a)(2). A regulation covers — and thus preempts— the plaintiffs claim if it “substantially subsume[s] the subject matter” of that claim. Easterwood, 507 U.S. at 664, 113 S.Ct. 1732 (noting that the regulation must do more than “touch upon or relate to [the] subject matter”). In this step, we rely on precedent — -including cases that predate the 2007 amendment. This two-step approach is consistent with the text of the amended FRSA and its history, and is similar to approaches in the Eighth and Tenth Circuits. Grade v. BNSF Ry. Co., 676 F.3d 680, 686 (8th Cir.2012); Henning, 530 F.3d at 1216.
Ill
We address each of Zimmerman’s claims in turn.
A
Zimmerman’s first claim is that Norfolk Southern negligently failed to warn him of the approaching train. In Zimmerman’s complaint, this claim has at least three parts: (1) the train failed to obey the speed limit; (2) the train failed to use its light and horn; and (3) Norfolk Southern failed to provide motorists with an adequate view of the track. But Zimmerman conceded during oral argument that he lacks evidence that the train failed to use its light and horn, and the duty to provide adequate sight distance is a separate duty, as discussed in Part III.B. Zimmerman’s first claim thus boils down to a single claim: excessive speed.

1. Zimmerman’s excessive-speed claim is not preempted because 49 C.F.R. § 218.9 creates a federal standard of care.

Railroads have a duty under Pennsylvania law to warn motorists of approaching trains. Wilson v. Pa. R.R. Co., 421 Pa. 419, 219 A.2d 666, 668-69 (1966). This duty requires railroads to avoid excessive speeds, since motorists are less likely to see speeding trains, and sight is an important warning method. See id. (explaining the relationship between a *179 train’s speed and its warning and noting that speeding trains have less time to stop); see also Conner v. Pa. R.R. Co., 263 F.2d 944, 945-46 (3d Cir.1959).
Norfolk Southern allegedly violated this duty by operating its train at more than double the speed limit. A federal regulation establishes the speed limit for each class of tracks: ten miles per hour for freight trains on Class 1 tracks, twenty-five miles per hour on Class 2 tracks, forty miles per hour on Class 3 tracks, and so on. 49 C.F.R. § 213.9. Both sides agree that the train was travelling no more than twenty-five miles per hour when it entered the crossing. Zimmerman alleges that the track at the crossing was Class 1, which would mean the train was travelling in excess of the speed limit. Norfolk Southern responds that the track was Class 2 or 3, which would mean the train was travel-ling within the limit.
The initial question is whether 49 C.F.R. § 213.9 preempts Zimmerman’s excessive-speed claim. We note at the outset that no other federal court of appeals has considered whether such claims are preempted under the amended FRSA provision. Before the 2007 amendment, the Supreme Court held that speeding claims are preempted when a train is travelling below the federally mandated speed limit. Easterwood, 507 U.S. at 673-75, 113 S.Ct. 1732 (concluding that the plaintiffs claim was preempted when the train was travelling, at most, fifty miles per hour on tracks with a limit of sixty miles per hour); see also Waymire v. Norfolk & W. Ry. Co., 218 F.3d 773, 776 (7th Cir.2000) (relying on Easterwood to conclude that an excessive-speed claim was preempted under the FRSA when the train was travelling below the speed limit). But Easterwood is inapposite here because Zimmerman alleges that the train he collided with was travel-ling above the speed limit.
Zimmerman’s excessive-speed claim avoids preemption if § 213.9 creates a federal standard of care. A regulation creates a standard of care for FRSA preemption purposes if it establishes the degree of care that the defendant—in most cases, the railroad—must exercise. See Black’s Law Dictionary 1441 (8th ed.2004) (defining “standard of care” as “the degree of care that a reasonable person should exercise”); see also Henning, 530 F.3d at 1216 (concluding there is no federal standard of care if the regulation takes the “final authority to decide” what action is needed “out of the railroad’s [hands]” (internal quotations marks and citations omitted)); Grade, 676 F.3d at 686 (same).
[10] The Minot derailment cases provide a good example of regulations that create a federal standard of care. Indeed, at least some members of Congress had these cases in mind when amending the FRSA. See H.R.Rep. No. 110-259, at 351 (2007), reprinted in 2007 U.S.C.C.A.N. 119, 119 (noting that the goal of the FRSA amendment was “to rectify the Federal court decisions related to the Minot, North Dakota accident that are in conflict with precedent”). The plaintiffs in Mehl v. Canadian Pacific Railway alleged that the railroad had violated a number of regulations, including 49 C.F.R. §§ 215.11 and 215.13, which require railroads to inspect tracks and freight cars. See 417 F.Supp.2d 1104, 1115 & n. 5 (D.N.D.2006). In prescribing how these inspections should be carried out, the regulations create a federal standard of care because they establish the degree of care that railroads must exercise. By contrast, a regulation does not establish a federal standard of care if the state is responsible for compliance. See Grade, 676 F.3d at 686 (concluding that various regulations did not create a federal standard of care because they “place the responsibility for imple *180 menting adequate warning devices on the State, thereby preempting any cause of action alleging a railroad failed to properly install an adequate warning device”). After all, if the state is responsible, railroads cannot, “as a matter of law, fail to comply” with the regulation. Id. (citation and internal quotation marks omitted).
We conclude that the speed limits in § 213.9 create a federal standard of care. Section 213.9 establishes the degree of care that railroads must exercise on each class of tracks: trains should not exceed ten miles per hour on Class 1 tracks, twenty-five miles per hour on Class 2 tracks, and so on. Like the regulations in Mehl and unlike the regulations in Grade, railroads are ultimately responsible for compliance — they must ensure that their trains are travelling within the limit. As a result, Zimmerman’s speeding claim is not preempted. Because his claim avoids preemption in the first step of the FRSA preemption analysis, we need not consider the second step.

2. The District Court improperly excluded eight crossing reports.

Zimmerman’s excessive-speed claim has cleared the preemption hurdle, but it must also clear an evidentiary hurdle. Zimmerman acknowledges that the train was travelling within the speed limit for Class 2 and Class 3 tracks. He alleges, however, that the track was Class 1. There is some evidence to support this allegation.
The record contains two types of documents that help Zimmerman: crossing reports from the Department of Transportation’s National Crossing Inventory and accident reports from a similar database. The crossing reports state that the speed limit is ten or fifteen miles per hour, and at least some of the accident reports suggest that the track is Class 1. The District Court nevertheless excluded these documents based on two evidentiary privileges: 23 U.S.C. § 409 and 49 U.S.C. § 20903. Zimmerman argues that the District Court misconstrued these privileges. We consider the crossing reports here and the accident reports in the next section.
The National Crossing Inventory is a database of highway-railroad crossings in the United States. The inventory contains reports on each crossing, which include information such as the number of trains that pass through daily, the typical train speed, and the maximum speed. Zimmerman accessed the database and obtained nine reports on the Diller Avenue crossing — the oldest from 1970 and the most recent from 2010. The nine reports were submitted to the national inventory by different entities: four by the Commonwealth of Pennsylvania, two by Norfolk Southern, and two by Conrail, the prior owner of the crossing. It is unclear who submitted the initial report. The reports state that the typical train speed over the crossing is five to ten miles per hour and that the “Maximum Time Table Speed” is ten or fifteen miles per hour.[6]
According to these crossing reports, Norfolk Southern’s train was travelling too fast at the time of the collision. Nevertheless, the District Court excluded them based on the privilege created by 23 U.S.C. § 409:
Notwithstanding any other provision of law, reports, surveys, schedules, lists, or data compiled or collected for the purpose of identifying, evaluating, or planning the safety enhancement of potential *181 accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to sections 130, 144, and 148 of this title or for the purpose of developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds shall not be subject to discovery or admitted into evidence in a Federal or State court proceeding or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists, or data.
Though pleonastically expressed, this statutory privilege clearly has two parts. The first part excludes reports, data, and the like if they were compiled or collected to identify, evaluate, or plan “the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to sections 130, 144, and 148 of [Title 23].” The second part excludes such documents if they were compiled or collected to develop “any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds.” The District Court concluded that the crossing reports were privileged under the first part of § 409.
Like all evidentiary privileges, we interpret this privilege narrowly. Pierce Cnty. v. Guillen, 537 U.S. 129, 144, 123 S.Ct. 720, 154 L.Ed.2d 610 (2003) (concluding that courts should interpret § 409 narrowly because it “impede[s] the search for the truth”). Moreover, the party invoking an evidentiary privilege has the burden of proof. See In re Grand Jury Investigation, 918 F.2d 374, 385 n. 15 (3d Cir.1990) (“[A] party who asserts a privilege has the burden of proving its existence and applicability.”).
We begin with the first part of the § 409 privilege. Both sides agree that the reports from the National Crossing Inventory were collected to evaluate railway-highway crossings. They disagree, however, that the reports were collected “pursuant to sections 130, 144, and 148 of [Title 23].” Zimmerman asserts that collection of the reports was not pursuant to any section, while Norfolk Southern asserts that they were collected pursuant to § 130.
Congress passed the Federal-Aid Highway Act in 1973. Pub.L. No. 93-87, 87 Stat. 250 (1973). The Act created the Federal Railroad Administration and imposed various safety-related obligations on states that accept federal funds. Some of these obligations are now codified in 23 U.S.C. § 130. In particular, subsection (d) requires states to maintain an inventory of railroad crossings within their borders:
Each State shall conduct and systematically maintain a survey of all highways to identify those railroad crossings which may require separation, relocation, or protective devices, and establish and implement a schedule of projects for this purpose. At a minimum, such a schedule shall provide signs for all railway-highway crossings.
23 U.S.C. § 130(d). When it was first passed, the Act did not require any federal agency to maintain a national crossing inventory.
Despite the absence of a statutory requirement, various federal agencies, state highway departments, and private railroad associations “formed a voluntary cooperative effort” to create the National Crossing Inventory. Federal Railroad Administration, U.S. DOT National Highway-Rail Crossing Inventory: Policy, Procedures and Instructions for States and Railroads 3 (2007), http://www.fra.dot.gov/downloads/ safety/RXIPolicyInstructions0807.pdf [“2007 Manual ”]. Railroads and the De *182 partment of Transportation agreed to share the costs, and the Federal Railroad Administration became responsible for maintaining the national inventory. See Federal Railroad Administration, Highway-Rail Crossing Inventory Instructions and Procedures Manual 1-3 to 1-4 (1996), http://www.fra.dot.gov/rrs/pages/fp_1499. shtml [“1996 Manual ”].
Over the next few decades, states and railroads voluntarily submitted information to the inventory. The submission process changed over time — states and railroads sometimes submitted information independently, and railroads sometimes submitted information to states, which then passed it along to the national inventory. Compare id. at 4-1 (“[T]he State transportation agency should be the party who forwards all data item changes for any and all crossings to the [Federal Railroad Administration].” (emphasis omitted)), with 2007 Manual at 44-45 (indicating that railroads should send some information directly to the Federal Railroad Administration). Many states willingly submitted information to the national inventory because they were able to meet their duty to create a statewide inventory under § 130(d) by participating in the national inventory. See 1996 Manual at 1-1.
The cooperative effort notwithstanding, gaps remained in the National Crossing Inventory thirty years later. See Letter from Norman Y. Mineta, U.S. Sec’y of Transp., to J. Dennis Hastert, Speaker of the U.S. House of Representatives (July 11, 2003), http://testimony.ost.dot.gov/fmal/ rail04.pdf. The Department of Transportation urged Congress to pass legislation that would force states and railroads to fill the gaps. Id. Congress eventually responded by passing the Rail Safety Improvement Act of 2008, Pub.L. No. 110-432, 122 Stat. 4848. This Act requires states and railroads to independently submit information to the Secretary of Transportation on a regular basis. Significantly, the Act codified the submission requirements in separate places: the state-reporting requirement in 23 U.S.C. § 130(1) and the railroad-reporting requirement in 49 U.S.C. § 20160.
As noted above, the record in this case contains two reports submitted to the National Crossing Inventory after the passage of the Rail Safety Improvement Act in 2008. Both were submitted in 2010, one by the Commonwealth of Pennsylvania, the other by Norfolk Southern. J.A. 995-98. The question, again, is whether they were collected or compiled pursuant to § 130.
We conclude that after the 2008 Act, state-submitted reports are collected pursuant to § 130, but railroad-submitted reports are not. As a result, only state reports are privileged under the first part of § 409. Our conclusion is textually based: states must submit crossing reports to the national inventory under 23 U.S.C. § 130(i) (which § 409 references), while railroads must submit under 49 U.S.C. § 20160 (which § 409 does not reference). State reports are thus collected “pursuant to section[ ] 130,” and railroad reports are not. Congress could have placed the railroad-reporting requirement in § 130 alongside the state requirement— in that case, railroad reports would be similarly privileged. But Congress instead chose to place the requirement in a different title of the United States Code. We regard that drafting choice as meaningful. Congress may well have had a stronger interest in protecting states, rather than railroads, from litigation. See Guillen, 537 U.S. at 147, 123 S.Ct. 720 (indicating that the primary goal of § 409 is to protect “state and local governments”). Whatever the reason, the text is plain. Accordingly, the 2010 Pennsylvania report is privileged *183 under the first part of § 409 and the 2010 Norfolk Southern report is not.
The record also contains seven reports submitted prior to the passage of the Rail Safety Improvement Act of 2008 — some submitted by the Commonwealth of Pennsylvania, others by various railroads including Norfolk Southern. At first blush, the analysis is straightforward. Neither 23 U.S.C. § 130(2) nor 49 U.S.C. § 20160 existed before 2008. States and railroads voluntarily participated in the National Crossing Inventory, so they did not submit reports pursuant to § 130 or any other statute. Even so, a few factors complicate the analysis.
The first complication is that § 130(d) has long required states to maintain statewide inventories of railroad crossings. State inventories are thus “compiled ... pursuant to section! ] 130” and so are privileged under § 409. To be sure, the pre2008 reports in this case are from the national inventory. But states presumably rely on their own inventories when submitting reports to the national inventory. It is therefore possible that the pre-2008 Pennsylvania reports from the national inventory either were originally collected pursuant to § 130 or rely on data originally collected pursuant to § 130.[7]
The second complication is that before the 2008 Act, railroads often submitted crossing reports directly to the states. The states used the railroad reports to create their inventories and then passed them along to the national inventory. See 1996 Manual at 4-1. Such railroad reports were thus “collected” by the states “pursuant to section!] 130.” Again, the pre-2008 railroad reports in this case are from the national inventory, but it is possible that the Commonwealth originally collected these reports to create its own inventory pursuant to § 130(d).
These complications raise the following question: Do reports originally collected pursuant to § 130(d) — and therefore privileged under § 409 — lose the privilege when voluntarily submitted by a state to the federal government? Zimmerman contends that the answer is found in Guillen. There, the county sheriff prepared an accident report after a deadly car crash. 537 U.S. at 136-40, 123 S.Ct. 720. The county public works department later acquired the report and used it to apply for funding under 23 U.S.C. § 152, which was one of the statutes listed in § 409 at the time. The Court concluded that the report was privileged in the hands of the public works department because the department collected it pursuant to § 152. Id. at 144-46, 123 S.Ct. 720. The Court nevertheless concluded that the same report was not privileged in the hands of the sheriff because he did not collect it pursuant to any statute listed in § 409. Id.
Guillen indicates that the question is whether the immediate source of the documents — here, the Federal Railroad Administration — “collected” them “pursuant to sections 130, 144, and 148 of [Title 23].” 23 U.S.C. § 409. But there is one important difference between the case before us and Guillen. The pre-2008 reports in our case might have been originally collected pursuant to § 130(d), whereas the report in Guillen was not originally collected pur *184 suant to any statute listed in § 409. See 537 U.S. at 144-46, 123 S.Ct. 720. The Eighth Circuit has suggested that this difference is meaningful. See Robertson v. Union Pac. R.R. Co., 954 F.2d 1433, 1435 (8th Cir.1992) (excluding a newspaper article that relied on privileged data to prevent “circumventing] the purpose of the statute”).
We need not decide this difficult question. Norfolk Southern bears the burden of proving that the privilege applies. See In re Grand Jury Investigation, 918 F.2d at 385 n. 15. And it has failed to show that the seven national reports from before 2008 were ever “collected ... pursuant to section[ ] 130.” As we have pointed out, it is certainly possible that the reports either were originally collected pursuant to § 130(d) or relied on data collected pursuant to § 130(d). But Norfolk Southern has offered no evidence that they were, and we construe the available evidence in the light most favorable to Zimmerman. As a result, we conclude that the District Court improperly excluded the seven pre-2008 crossing reports at the summary-judgment stage.
Although eight crossing reports are not covered by the first part of the privilege, they will still be inadmissible if they fall within the second part — that is, if they were “compiled or collected ... for the purpose of developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds.” 23 U.S.C. § 409. We turn to this second part.
There are two plausible interpretations of the relevant language in § 409. The broad interpretation is that a report was “collected ... for the purpose of developing any highway safety construction improvement project” if the agency collected the report with the understanding that someone might use it to improve highway safety in a later construction project.[8] The narrow interpretation is that a report was collected for the statutory purpose if the agency collected it with the intent to use it for a particular construction project. In short, the broad interpretation would privilege any document that was collected to improve highway safety — such as reports in a database — while the narrow interpretation would privilege only those documents that were collected for a particular project.
We follow the Supreme Court’s example and adopt the narrow interpretation. See Guillen, 537 U.S. at 144-45, 123 S.Ct. 720 (noting two plausible interpretations of a separate clause in § 409 and adopting the “narrower view”). First, “statutes establishing evidentiary privileges must be construed narrowly because privileges impede the search for the truth.” Id.; see also In re Grand Jury Investigation, 918 F.2d at 386 (recognizing “the general constructional rule that evidentiary privileges should be narrowly construed”).
Furthermore, the narrow interpretation is more faithful to the text. The broad interpretation renders much of § 409 redundant: if the second part privileges any document that might be used to improve highway safety in a later construction project, there would be no need for the first part to privilege documents “compiled or collected for the purpose of identifying, evaluating, or planning the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings.” After all, these specific purposes all deal with information that might *185 be used to improve safety in a later project. So every document that is privileged under the first part would also be privileged under the second part. We eschew the broad interpretation to avoid redundancy. See Gustafson v. Alloyd Co., 518 U.S. 561, 574, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) (“[T]he Court will avoid a reading which renders some words altogether redundant.”); Ki Se Lee v. Ashcroft, 368 F.3d 218, 223 (3d Cir.2004) (recognizing “the goal of avoiding surplusage in construing a statute”).
And the privilege uses different verbs in the first and second parts — “identifying, evaluating, or planning” in the first and “developing” in the second. The first part seems to privilege documents that deal with both potential and actual projects, while the second part appears to privilege only those documents that deal with actual projects. Or to put it another way, the second part privileges documents prepared when the agency already has a construction project in mind — and not simply documents that might be used to plan later projects.
We conclude that the second part of § 409 excludes only those documents that were collected for a particular highway-safety construction project. Here, there is no indication that the Diller Avenue reports were collected for a particular project — instead, they were collected to establish a national database that might be used in future projects. The second part of § 409 does not apply.
In sum, Zimmerman has nine crossing reports that suggest the Norfolk Southern train was going too fast when it entered the Diller Avenue crossing. The District Court excluded all nine reports under § 409. It should, however, have excluded only the 2010 Pennsylvania report. We now consider Zimmerman’s other evidence of excessive speed.

3. The District Court improperly excluded nine accident reports.

Zimmerman obtained ten Department of Transportation accident reports. The reports cover accidents that occurred at the Diller Avenue crossing over the past few decades, from a minor collision in 1975 to Zimmerman’s crash in 2008. The reports describe the conditions of the accident — weather, number of injuries, time of day, and so on. And they list the classification of the track at the crossing: four reports state that the track was Class 2, one that it was Class 3, and five — all from the 1970s — that it was Class 1. The ten reports provide at least mixed evidence that the crossing was Class 1 and thus that the Norfolk Southern train was speeding. Even so, the District Court excluded the reports based on another evidentiary privilege: that contained in 49 U.S.C. § 20903.[9] This statute states in part:
No part of an accident or incident report filed by a railroad carrier under section 20901 of [Title 49] ... may be used in a civil action for damages resulting from a matter mentioned in the report.
The parties agree that the accident reports were “filed by a railroad carrier” under 49 U.S.C. § 20901. But Zimmerman argues that the privilege excludes only the report of his accident, not the nine other reports. His argument is textual: the privilege does not exclude accident reports from all civil cases. It merely excludes reports from civil cases that result “from a matter mentioned in the report.” In Zimmerman’s view, his “civil action for *186 damages” arose from the accident mentioned in his report, but it did not arise from the accidents mentioned in the remaining nine reports. We agree that these reports fall outside the privilege.
Norfolk Southern urges us to broadly interpret the term “matter.” In Norfolk Southern’s view, “matter mentioned in the report” does not simply mean “the accident mentioned in the report,” as Zimmerman implicitly argues. It also means “the location mentioned in the report.” The privilege therefore excludes all ten reports, since Zimmerman’s lawsuit is “a civil action for damages resulting from a matter” — or location, the Diller Avenue crossing — “mentioned in the report[s].” This argument is unpersuasive because Norfolk Southern takes the word “matter” completely out of context. The phrase “damages resulting from” appears directly before the word “matter,” indicating that a “matter” is the event that caused the harm discussed in the report. See Lee v. Nat’l R.R. Passenger Corp. (Amtrak), No. 3:10— cv-00392, 2012 WL 130267, at *2 (S.D.Miss. Jan. 17, 2012) (holding that § 20903 does not apply to prior accident reports at the same crossing). We conclude that § 20903 excludes the report of Zimmerman’s accident but not the nine other reports.
Norfolk Southern also argues that the § 409 privilege excludes the accident reports. Again, the privilege has two parts. The first part excludes reports collected to identify, evaluate, or plan “the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to sections 130, 144, and 148 of [Title 23].” This part plainly does not apply because the accident reports were collected pursuant to 49 U.S.C. § 20901 — not pursuant to any section of Title 23.
The second part of § 409 excludes reports if they were collected to develop “any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds.” As we concluded above, the language excludes only those documents that were collected for a particular highway-safety construction project. Like the reports in the National Crossing Inventory, accident reports are collected for a variety of reasons. One reason is to provide data for future safety projects. In most cases, however, accident reports are not collected for a particular highway-safety construction project. Nor does Norfolk Southern point to any evidence that the Diller Avenue accident reports were collected for a particular project. Therefore, nine of the ten accident reports are admissible.
Based on the foregoing, we conclude that most of the crossing reports and accident reports are admissible. These reports suggest that the speed limit at the crossing was ten miles per hour or, equivalently, that the track was Class 1. That said, Zimmerman’s claim is far from a slam-dunk. Other evidence suggests that the track was Class 2 or Class 3. Norfolk Southern claims that it reclassified the track but failed to update the crossing reports. This claim is consistent with the accident reports — the most recent reports list the track as Class 2 or Class 3. But acceptance or rejection of Norfolk Southern’s explanation is the province of a jury. For now, the conflicting evidence results in Zimmerman’s excessive-speed claim surviving summary judgment.
A Zimmerman’s alternative claim of track misclassification is preempted.
Zimmerman advances an alternative argument. If the track was in fact classified as Class 2 or Class 3, Zimmer *187 man claims that Norfolk Southern should be liable for misclassification. According to Zimmerman, the limited sight distance imposed a duty on Norfolk Southern to classify the track as Class 2 or higher.
The first question — and, as it turns out, the only question — is whether Zimmerman’s alternative claim avoids preemption. Zimmerman argues that Norfolk Southern violated a federal standard of care. See 49 U.S.C. § 20106(b)(1)(A). He points to 49 C.F.R. pt. 213, which contains regulations for each class of tracks. But none of the regulations discuss track visibility. Zimmerman curiously cites two regulations that have nothing to do with visibility. See 49 C.F.R. §§ 234.203 (setting standards for control circuits), 234.225 (regulating the activation of warning systems). He also points to a regulation in Title 23 that mentions the term “sight distance.” 23 C.F.R. § 646.214(E). But this regulation merely states that a flashing signal might be necessary if the sight distance is “unusually restricted.” It does not require railroads to select a track class based on sight distance — nor does any regulation establish the sight distance necessary for each track class. Quite simply, no relevant federal standard of care exists.
Despite the absence of a federal standard of care, Zimmerman may still avoid preemption if his claim falls outside the scope of the original FRSA preemption provision. See 49 U.S.C. § 20106(a)(2). As we have previously made clear, state claims are within the scope of this provision if federal regulations “cover” or “substantially subsume” the subject matter of the claims. Strozyk, 358 F.3d at 273 (citing 49 U.S.C. § 20106(a)(2); Easterwood, 507 U.S. at 664, 113 S.Ct. 1732). The regulations must do more than “touch upon or relate to that subject matter.” Easterwood, 507 U.S. at 664, 113 S.Ct. 1732 (internal quotation marks omitted).
The regulations in 49 C.F.R. pt. 213 subsume Zimmerman’s misclassification claim. These regulations establish varying requirements for each class of tracks-governing everything from gage, alinement, and elevation, to crossties, curve speed, and rail joints. See 49 C.F.R. §§ 213.53 (explaining the proper method for measuring gage), 213.55 (creating alinement standards), 213.57 (establishing the maximum speed based on track elevation and curvature), 213.109 (requiring more crossties for higher track classes), 213.121 (noting that rail joints must “be of a structurally sound design”).
The regulations are part of a broad scheme to standardize railroad tracks. Admittedly, there is no regulation that classifies tracks based on sight distance. But the breadth of the scheme implies a decision not to classify on that basis. At the very least, it implies that the federal government did not want states to decide how tracks would be classified. We doubt that the federal government would create a detailed system with the expectation that states would impose extra classification requirements — especially given the risk that the requirements would vary from state to state. This regulatory scheme preempts Zimmerman’s misclassification claim.
B
Zimmerman’s second claim is that Norfolk Southern failed to maintain a safe crossing area. As before, we must address the threshold question of preemption. We then consider whether Zimmerman produced sufficient evidence to avoid summary judgment.

1. Zimmerman’s claim of failure to maintain a safe crossing area is not preempted.

Zimmerman makes two allegations in support of his unsafe-crossing *188 claim. The first is that Norfolk Southern negligently maintained the crossing devices at Diller Avenue — in particular, “the sign that warned of the approaching crossing was covered by tree branches, the pavement markings no longer existed, and the crossbucks had been allowed to fall into disrepair.” Appellant’s Br. at 43. Zimmerman’s second allegation is that Norfolk Southern failed to provide adequate sight distance.[10]
Strozyk is directly on point. There, we considered a claim for wrongful death resulting from a crash at a railroad crossing. 358 F.3d at 270. The decedent’s estate alleged that the railroad had failed to keep the crossing safe. We interpreted what is now subsection (a) of the FRSA preemption provision and explained that “[a] railroad may still be liable for other negligent conduct, such as the failure to maintain a working crossing arm.... ” Id. at 276 (quoting Evans Timber Co. v. Cent. of Ga. R.R. Co., 239 Ga.App. 262, 519 S.E.2d 706, 709-10 (1999)); see also Terrell v. Soo Line R.R. Co., No. 2:04-cv-095, 2005 WL 4882750, at *7 (S.D.Ind. Sept. 1, 2005) (noting that preemption would improperly insulate railroads “even if the crossbucks had fallen to the ground and were unobservable by a passing motorist”). We also concluded that 23 C.F.R. § 646.214(b)(3) does not preempt sight-distance claims, even though the regulation mentions “unusually restricted sight distance” as a factor that might require states to install flashing lights. We reasoned that “the plain language” of the regulation “indicates that the subject matter is the adequacy of warning devices, not the considerations involved in choosing them or state negligence law more broadly.... The bare mention of [conditions such as sight distance] does not indicate an intent to regulate those conditions.” Strozyk, 358 F.3d at 273.
The 2007 FRSA amendment did not supersede Strozyk,[11] and thus both parts of Zimmerman’s unsafe-crossing claim avoid preemption. See id. at 277 (“[The plaintiffs’] claims that [the defendant] failed to maintain a safe grade crossing ... and relatedly failed to ensure clear sight lines of oncoming trains are not preempted.”). Even if Strozyk were not binding, Zimmerman’s negligent-maintenance allegation would avoid preemption because 49 C.F.R. § 234.245 creates a federal standard of care governing the maintenance of cross-bucks. 49 U.S.C. § 20106(b)(1)(A); see 49 C.F.R. §§ 234.245 (“Each sign mounted on a highway-rail grade crossing signal post shall be maintained in good condition and be visible to the highway user.”), 234.3 (indicating that railroads are responsible for maintaining signs under § 234.245).[12]

2. Zimmerman produced sufficient evidence that Norfolk Southern failed to maintain the crossing devices and that the sight distance was inadequate.

The District Court agreed that at least part of Zimmerman’s second claim avoided preemption. The Court nevertheless granted summary judgment on his
*189 entire claim, concluding that he had failed to satisfy the elements of negligence. In particular, the Court concluded that Norfolk Southern did not have “a duty to remove a privately owned building that potentially obscure[s] sight lines.” Zimmerman v. Norfolk S. Corp., No. 10-cv-02267, 2011 WL 3625039, at *12 n. 9 (E.D.Pa. Aug. 17, 2011). Zimmerman argues that the District Court ignored his inadequate-maintenance allegation and misconstrued Pennsylvania law on the question of sight distance. We agree with Zimmerman — both parts of his second claim survive summary judgment.
We first consider Zimmerman’s allegation that the warnings had fallen into disrepair. The well-worn elements of common-law negligence are, of course, duty, breach, causation, and damages. Under Pennsylvania law, railroads have a duty to maintain railroad warning devices. Geelen v. Pa. R.R. Co., 400 Pa. 240, 161 A.2d 595, 598 (1960) (“A railroad company is under a duty to maintain a public crossing in a state of good repair.”); see also Conner, 263 F.2d at 946 (stating that under Pennsylvania law, a railroad might be liable for failing to maintain crossing devices); Buchecker v. Reading Co., 271 Pa.Super. 35, 412 A.2d 147, 153 (1979) (considering “evidence that the signal was not operating at the time” of the accident).[13]
According to Zimmerman, Norfolk Southern breached this duty because “the sign that warned of the approaching crossing was covered by tree branches, the pavement markings no longer existed, and the crossbucks had been allowed to fall into disrepair.” Appellant’s Br. at 43. Viewed in the light most favorable to Zimmerman, the record supports these allegations.
Photographs suggest that there once was a white line north of the crossing, but that the line had faded by the time of Zimmerman’s collision. See J.A. 508, 716, 983.[14] Other photographs indicate that tree branches covered both the crossbuck *190 and the yellow advanced warning sign. For example, a 2008 photograph shows that tree branches covered the yellow warning sign — although the picture is too dark and grainy to be conclusive. See id. 516. And a series of photographs from 2011 show that a tree standing next to the warning sign partially obscures the cross-buck — at least from the perspective of someone who is more than 250 feet away. See id. at 719-20.[15] Both parties cite an expert’s statement that tree branches covered the crossbuck, see Appellant’s Br. at 43 (citing J.A. 690); Appellee’s Br. at 31 n. 11 (same), but the expert’s report mysteriously contains no such statement. Either way, a reasonable jury could accept Zimmerman’s narrative based on the photographs.
Norfolk Southern also argues that there is insufficient evidence of causation. Darkness had fallen by the time Zimmerman began riding home. He may well have hit the train even if the obscuring branches had been pruned and the white line had been repainted. Yet in his deposition, Zimmerman said that he had crossed the track many times before the accident and that he believed the crossing was inactive. J.A. 235 (“[I] did not know that that track had a regular train on it. I have never seen a train on that track.... I certainly wasn’t expecting — to my knowledge, it was an unused track.”). From this testimony — and from the other evidence that the crossing was poorly maintained— it is reasonable to infer that state of disrepair at least contributed to his belief that the crossing was inactive. See InterVest, Inc. v. Bloomberg, L.P., 340 F.3d 144, 159-60 (3d Cir.2003) (“When analyzing the sufficiency of the evidence, the court must view the facts and any reasonable inferenees drawn therefrom in the light most favorable to the party opposing summary judgment.”). As a result, it is also reasonable to infer that on the night of the accident, he approached the crossing with less caution than he otherwise would have.
We now turn to the allegation that Norfolk Southern failed to provide adequate sight distance. This allegation also survives summary judgment. Under Pennsylvania law, railroads have a duty to ensure that motorists are able to see approaching trains. See Fallon v. Penn Cent. Transp. Co., 444 Pa. 148, 279 A.2d 164, 167 (1971): The District Court cited our opinion in Strozyk and concluded that the duty merely requires railroads to remove excess vegetation, as there is no “duty to modify or remove a privately owned building which is located off the railroad’s right of way.” Zimmerman, No. 10-cv-02267, 2011 WL 3625039, at *12 n. 9 (citing Strozyk, 358 F.3d at 276-77).
But Pennsylvania courts have held that the duty extends well beyond the removal of vegetation. In Johnson v. Pa. R.R. Co., 399 Pa. 436, 160 A.2d 694 (1960), a motorist’s view was obstructed by buildings, utility poles, and a hedge. The Pennsylvania Supreme Court concluded:
A railroad company may, in some instances have no choice as to location of crossings, ... but where, as here, physical conditions visually blanket the speeding train until several short seconds before it sweeps, like a steel and iron tornado, into a crossing, a due responsibility for the safety of mankind dictates that something be done to alert the public of the omnipresent danger....
*191 Id. at 697. In Fallon, the Pennsylvania Supreme Court found sufficient evidence of negligence where the plaintiffs’ view was obstructed by a building. 279 A.2d at 167. According to the court, “it was difficult if not impossible to gain an adequate view of the west-bound track without putting one’s car in or dangerously close to the swath of an oncoming train.” Id.; see also Buchecker, 412 A.2d at 156-57 (“[I]t is proper for the jury to take into consideration the physical conditions at the crossing ... [and] the nature of the surroundings.”) (citing Cummings v. Pa. R.R., 301 Pa. 39, 151 A. 590, 591 (1930)). To be sure, no Pennsylvania court has expressly held that railroads have a clear duty to modify private buildings. But cases such as Johnson and Fallon have indicated that the jury should consider privately owned buildings when deciding whether the railroad breached its duty to provide adequate sight distance.
We conclude that the building in this case is relevant in deciding whether Norfolk Southern provided adequate sight distance. The jury can decide whether Norfolk Southern should have asked the building’s owner to remove a sign that was along Diller Avenue. Norfolk Southern even had a policy for doing so: “If an obstruction is located off the right-of-way, the owners of the land containing the obstruction should be contacted personally and an appeal made to the landowner to remove the obstruction. The personal contact should be followed up with a letter, with a copy to the appropriate state agency.” J.A. 1051. If the appeal fails, “the matter should be referred to the Law Department for guidance,” id, presumably to decide whether to use eminent domain under 15 Pa. Cons.Stat. § 1511 (allowing public utility corporations such as railroads to use eminent domain).
The jury can also decide whether Norfolk Southern should have enlisted the help of the Commonwealth or used eminent domain. And if the jury decides that Norfolk Southern breached its duty, Norfolk Southern’s policy and 15 Pa. Cons. Stat. § 1511 might be evidence of causation. They suggest that Norfolk Southern could have improved conditions at the crossing in a way that would have prevented the accident.[16]
Zimmerman’s second claim is far from overwhelming- — the evidence of disrepair is conflicting, and it is unclear whether Norfolk Southern’s inaction caused the sight distance to remain inadequate. All the same, we must construe the evidence in the light most favorable to Zimmerman. There is sufficient evidence of each element to allow the claim to go forward.
C
Zimmerman’s third and final claim is that Norfolk Southern was negligent per *192 se for violating various requirements in 23 C.F.R. § 646.214(b).[17] In particular, subsection (b)(3)® states that crossings with limited sight distance and high train speeds must have “adequate warning devices,” defined in the statute as automatic gates and flashing lights. And subsection (b)(1) states that all “traffic control devices” must comply with the Manual on Uniform Traffic Control Devices. Zimmerman asserts that Norfolk Southern violated both provisions. The District Court decided that the claim was preempted.
We agree that Zimmerman’s third claim is preempted. For starters, neither regulation creates a federal standard of care. See 49 U.S.C. § 20106(b)(1)(A). We analyze the regulations separately. Subsection (b)(3)(i)(C) states:
Adequate warning devices ... on any project where Federal-aid funds participate in the installation of the devices are to include automatic gates with flashing light signals when ... the following conditions exist: ... High Speed train operation combined with limited sight distance at either single or multiple track crossings.
Zimmerman argues that subsection (b)(3) creates a federal standard of care — one that requires Norfolk Southern to install automatic gates and flashing lights — because the sight distance at the Diller Avenue crossing is limited.
The Eighth and Tenth Circuits have rejected similar arguments. See Grade, 676 F.3d at 686-87 (concluding that 23 C.F.R. § 646.214(b)(3) and (4) preempt claims against railroads for installing inadequate warning devices at railroad crossings); Henning, 530 F.3d at 1215 (same). Subsection (b)(3) does not impose on railroads an ongoing duty — instead, it “displacéis] state and private decisionmaking authority.” Henning, 530 F.3d at 1212 (quoting Easterwood, 507 U.S. at 670, 113 S.Ct. 1732) (internal quotation marks omitted). More importantly, subsection (b)(3) “place[s] the responsibility for implementing adequate warning devices on the State, thereby preempting any cause of action alleging a railroad failed to properly install an adequate warning device.” Grade, 676 F.3d at 686. Railroads cannot, “as a matter of law, fail to comply” with subsection (b)(3). Id. (quoting Henning, 530 F.3d at 1215).
We find this reasoning persuasive. The Commonwealth of Pennsylvania installed crossbucks at the Diller Avenue crossing with the use of federal funds and the help of the crossing’s previous owner. Norfolk Southern, as the current owner, has a duty to maintain the crossing devices. See Strozyk, 358 F.3d at 276. But the Commonwealth is ultimately responsible for ensuring that the devices comply with subsection (b)(3). As a result, subsection (b)(3) does not impose on Norfolk Southern a federal standard of care.
The same is true of subsection (b)(1). Zimmerman tries to avoid Grade and Henning by asserting that Norfolk Southern also violated subsection (b)(1):
All traffic control devices proposed shall comply with the latest edition of the Manual on Uniform Traffic Control Devices for Streets and Highways supplemented to the extent applicable by State standards.
Zimmerman argues that subsection (b)(1) imposes on railroads an ongoing duty to update their crossing devices. Norfolk *193 Southern violated this supposed duty by failing to update the crossbucks to comply with the latest Manual on Uniform Traffic Control Devices. This argument is inconsistent with the text, which requires that “proposed” devices — not already existing devices — comply with the manual. Moreover, subsection (b)(1) is part of the same scheme as subsection (b)(3). Both subsections create rules that states must obey to receive federal funds. Neither imposes on railroads a standard of care.
Absent a federal standard, Zimmerman can avoid preemption only if there are no federal regulations that cover the subject matter of his inadequate-device claim. 49 U.S.C. § 20106(a)(2). Unfortunately for Zimmerman, the Supreme Court has already concluded that subsections (b)(3) and (b)(4) cover the subject matter of such claims. See Shanklin, 529 U.S. at 352-53, 120 S.Ct. 1467 (citing Easterwood, 507 U.S. at 670, 113 S.Ct. 1732). These regulations are preemptive because they “displace state and private decisionmaking authority by establishing a federal-law requirement that certain protective devices be installed or federal approval obtained.” Easterwood, 507 U.S. at 670, 113 S.Ct. 1732. Zimmerman tries to escape preemption by citing the Supreme Court’s statement that subsection (b)(1) “does not pre-empt state tort actions.” Shanklin, 529 U.S. at 352, 120 S.Ct. 1467. But this language does not save Zimmerman’s claim — subsections (b)(3) and (b)(4) clearly preempt his inadequate-device claim. It is of no consequence whether subsection (b)(1) does the same.
Zimmerman is unable to avoid preemption by asserting that Norfolk Southern installed the wrong warning devices' — even though he was able to avoid preemption by asserting that Norfolk Southern failed to maintain them. See supra Part III.B.l. While it may seem that this scheme is internally inconsistent, it is nonetheless the scheme Congress has established.
IV
Accordingly, we will reverse the District Court’s grant of summary judgment on Zimmerman’s first and second claims but affirm its grant of summary judgment on Zimmerman’s third claim.

. The proper party to this action appears to be Norfolk Southern Railway Company, a subsidiary of Norfolk Southern Corporation, but neither party has moved to amend the caption. See Zimmerman v. Norfolk S. Corp., No. 10-cv-02267, 2011 WL 3625039, at *1 n. 1 (E.D.Pa. Aug. 17, 2011). We refer throughout to the appellee as Norfolk Southern.

.Zimmerman has only a vague recollection of the events, so the experts have attempted to recreate the crash. One of Zimmerman’s experts concluded that "[w]hen Zimmerman was 76 to 97 feet away from the point of collision, the train was not visible.” J.A. 687.

. According to Zimmerman's expert, a vehicle travelling thirty-five miles per hour needs at least seventy-six feet to stop.

. The District Court had jurisdiction under 28 U.S.C. § 1332, and we have jurisdiction under 28 U.S.C. § 1291.

. Although the amendment’s plain text resolves the question before us, its history is *178 entirely consistent with our analysis. In 2002, a train carrying anhydrous ammonia derailed in Minot, North Dakota. Toxins filled the air, forcing many local residents to evacuate. The toxins killed one person and injured at least a hundred others. Two federal district courts considered tort claims arising from the derailment. Lundeen v. Canadian Pac. Ry. Co., 507 F.Supp.2d 1006, 1009 (D.Minn.2007); Mehl v. Canadian Pac. Ry., Ltd., 417 F.Supp.2d 1104, 1106 (D.N.D.2006). In both cases, the courts interpreted the FRSA and concluded that the plaintiffs' tort claims were preempted, even though the plaintiffs alleged that the railroad violated federal regulations and its own internal rules. See Mehl, 417 F.Supp.2d at 1116-17 (holding that the plaintiffs’ claims were preempted despite allegations that the railroad violated federal regulations); Lundeen, 507 F.Supp.2d at 1011-12 (holding that the plaintiffs’ claims were preempted despite allegations that the railroad violated its internal rules).
Congress renounced these interpretations by passing the 2007 amendment. A conference report stated that the goal was “to rectify the Federal court decisions related to the Minot, North Dakota accident that are in conflict with precedent.” H.R.Rep. No. 110-259, at 351 (2007), reprinted in 2007 U.S.C.C.A.N. 119, 183. The report also states that the "restructuring is not intended to indicate any substantive change in the meaning of the provision.” Id.

. Eight crossing reports state that the “Maximum Time Table Speed” is "10” — presumably meaning miles per hour. J.A. 995-1012. The ninth report states that the maximum speed is "15.” Id at 1008-09.

. Another complication is that some states meet their duty to create a state inventory by participating in the national inventory. See 1996 Manual at 1-1. This means that for some states, the privileged state inventories are their submissions to the national inventory. In that case, the reports from the national inventoiy might be privileged. We need not take on this issue because Pennsylvania has its own crossing inventory. See Pennsylvania Department of Transportation, Grade Crossing Electronic Document Management System (2012), https://www.dotl4.state.pa.us/ gcedmsweb/home.jsp.

. Despite the surfeit of modifiers, we interpret the phrase "highway safety construction improvement project” to mean simply a construction project that improves highway safety-

. The District Court also relied on 49 C.F.R. § 225.7(b), but this regulation merely repeats the § 20903 statutory privilege.

. Zimmerman also alleges that Norfolk Southern violated this duty by failing to provide flashing lights at the crossing. As we conclude in Part III.C below, the FRSA preemption provision bars claims of inadequate crossing devices.

. See supra Part II.

.Zimmerman also produced a document from the Federal Railroad Administration that suggested the necessary sight distance was 376 feet. See J.A. 697. This document, however, does not create a standard of care for preemption purposes because the document is not “a regulation or order issued by the Secretary of Transportation.” 49 U.S.C. § 20106.

. Judge Aldisert invokes the occupied-crossing rule to argue that Norfolk Southern did not have a duty to maintain the crossing devices. Neither party has mentioned this rule, and for good reason: it does not apply here. As the Pennsylvania Supreme Court has explained, the rule applies only when "an engine or a draft of cars is on the crossing or street or highway and is visible to such highway users." Cella v. Pa. R. Co., 364 Pa. 82, 70 A.2d 638, 640 (1950) (emphasis added). When both elements are met, "the presence of the engine or draft on the crossing or street [is] sufficient warning to [motorists] of the dangers incident thereto." Id. But a train's presence does not provide "sufficient warning” when it enters the crossing only after motorists have reached the point of no return. See Krentz v. Consol. Rail Corp., 589 Pa. 576, 910 A.2d 20, 28 n. 10 (2006) (noting that, despite the occupied-crossing rule, "the law does impose a duty on railroads to warn of approaching trains”).
Here, the train rushed into view at the last second. Because the train was not visible in time for Zimmerman to avoid the accident, see J.A. 687, the rule does not apply. A contrary holding would imply that a train racing down the tracks at double the speed limit would avoid liability whenever a motorist ran into it — even when the train's speed effectively prevented motorists from avoiding the collision.

. There is no painted line in a 2008 photograph, but there is a line in a 2011 photograph. See J.A. 508, 716, 983. Of course, subsequent remedial measures are inadmissible to prove negligence. See Fed.R.Evid. 407. Yet the paint in the 2011 photograph suggests that the pavement was painted before the 2008 accident, but that the marking faded and required a fresh coat of paint. This is not the only possible inference from the facts, but it is a "reasonable inference,” which is all that is necessary at this stage. InterVest, Inc. v. Bloomberg, L.P., 340 F.3d 144, 159-60 (3d Cir.2003) (explaining the standard for summary judgment).

. According to Judge Aldisert, Zimmerman did not argue that tree branches covered the crossbuck — only that the crossbuck had fallen into disrepair. But if Norfolk Southern in fact allowed tree branches to cover the cross-buck, it seems accurate to say that it “allowed” the crossbuck "to fall into disrepair.” Appellant's Br. at 43.

. Judge Aldisert invokes the longstanding duty to "stop, look, and listen” and argues that Norfolk Southern did not have an obligation in this case to provide adequate sight distance. See Briach v. Pa. R.R. Co., 462 F.2d 266, 268 (3d Cir.1972); 75 Pa.C.S. § 3341(a). Zimmerman supposedly violated this duty because he did not stop before crossing the tracks. This might be true, but Zimmerman’s negligence is a separate question. As the Pennsylvania Superior Court has explained, "one who fails to stop, look, and listen will not be precluded from recovery where the failure is not negligent." Buchecker v. Reading Co., 271 Pa.Super. 35, 412 A.2d 147, 154 (1979) (emphasis added).
The District Court explicitly refrained from deciding whether Zimmerman was negligent. Zimmerman, 2011 WL 3625039, at *21 n. 34 ("I do not need to consider defendant’s additional arguments that plaintiff was comparatively negligent by failing to comply with Pennsylvania law.”). And neither side has addressed the question of Zimmerman’s negligence on appeal. We therefore refuse to affirm on these grounds.

. Zimmerman also identifies a number of internal rules that Norfolk Southern supposedly violated. These supposed violations do not help Zimmerman avoid preemption because he fails to show the internal rules were "created pursuant to a regulation or order.” 49 U.S.C. § 20106(b)(1)(B).