OPINION OF THE COURT
JORDAN, Circuit Judge.
MD Mall Associates, L.L.C. (“MD Mall”), appeals from the summary judgment entered against it by the United States District Court for the Eastern District of Pennsylvania on MD Mall’s claims that CSX Transportation, Inc. (“CSX”), a railroad, is liable for storm water flooding MD Mall’s property. For the reasons that follow, we will vacate the District Court’s grant of summary judgment, and remand for further proceedings consistent with this opinion.
*483 I. Background[1]
A. The Runoff Problem
MD Mall owns and operates the Mac-Dade Mall (the “Mall”) located in Delaware County, Pennsylvania. The Mall is bounded on the south by a single railroad track owned by CSX, and, interestingly enough, on the east by South Avenue. CSX’s property consists of the track and two drainage ditches, one running along either side of the track. Houses located to the south of the track are at a higher elevation than the track, and the track is at a higher elevation than the Mall. CSX’s predecessor in interest designed and installed an earthen berm on the north side of the track to prevent storm water from flowing downhill onto the property occupied by the Mall. The berm straddles the property line of the Mall and the railroad, with the north side of it sloping down into the parking lot. The Mall claims ownership of that slope up to the crest of the berm.
For many years after being built, the berm prevented storm water from discharging onto MD Mali’s property. In October 2010, however, storm water breached the berm at a spot near South Avenue, allowing water runoff and debris from CSX’s property to flow down the slope and overwhelm a private storm water inlet located in the Mall parking lot. An MD Mall representative sent two letters, dated October 29, 2010, and.January 13, 2011, asking CSX to contact him to discuss a resolution to the. runoff problem. In response, CSX’s road master responsible for that portion of the track inspected the site. Based on the road master’s findings, a CSX engineer wrote in an internal memorandum that, “[flnstead of the water flowing over the crossing [at South Avenue] and down the road towards the storm drains, it is not reaching the crossing and [is] instead running towards the [Mall] property.” (App. at 56.) The engineer proposed that CSX dig a “[d]itch” on CSX property “along the area and block the hill leading to the property, allowing the water to flow into the road and- down to [a public] storm drain.” (App. at 56.) He also raised the possibility of installing a culvert under South Avenue to send the water to a nearby stream. In an email dated January 20, 2011, the engineer notified MD Mall that CSX intended to implement the first option, which was less costly, and that it would complete the project “in a timely fashion.” (App. at 57.)
Despite that assurance, CSX did not go forward with that plan. Instead, it began constructing a concrete spillway on the Mali’s side of the berm to direct CSX’s storm water into the Mall’s private drainage inlet. CSX workers cleared out a channel on the berm and set up wooden forms to create the spillway, all of which MD Mall asserts was done without its consent, while CSX claims that MD Mall had consented to the installation in order to stop múd and debris from entering the Mall property.
Whether or not there had been consent, when the Mali’s manager discovered what CSX was doing, he immediately halted the work, demanding that the wooden forms be removed and that the Mall’s side of the berm be restored to its original grade. CSX agreed to halt construction of the spillway, but requested permission to install riprap in the cleared out channel. *484 MD Mall granted consent in writing but insisted that CSX provide a permanent solution to the runoff problem. When CSX,was not forthcoming with a permanent solution, MD Mall filed the present suit, invoking diversity jurisdiction in the District Court.
B. Procedural History
MD Mall brought claims of negligence (Count I) and continuing storm water trespass (Count II) against CSX for “failing to properly maintain .CSX’s property so as to prevent water on CSX’s property from flowing over onto [MD Mall’s] property and causing damage.....”[2] (App. at 122.) Although it initially sought “compensatory and consequential damages ..., together with prejudgment interest and costs” (App. at 123), MD Mall later dropped its demand for damages and sought only in-junctive relief that would require CSX to remedy the runoff problem.
Both parties moved for summary judgment. MD Mall had learned during discovery that, in March 2009, CSX had refurbished the relevant portion of the track, deploying, approximately 30 pieces of heavy equipment - to replace 325 railroad ties. Based on that information, MD Mall argued in its motion for summary judgment that the “substantial modifications to the tracks’ drainage system” in 2009 “led to the discharge of CSX’s water run-off onto the Mall Property and the noticeably deep property erosion by fall 2010.” (Supplemental App. at 80.) For support, MD Mall cited the deposition testimony of its expert, Dr. Frank X. Browfte, who identi-fled the source of the water problem as CSX’s 2009 alteration of the drainage system and the hydrological condition of the property. MD Mall also asserted that, for five years, CSX had failed to clear out the ditch adjacent to the berm.
The fact that storm water had discharged from CSX’s property onto MD Mali’s property was evidence, according to MD Mall, that CSX had violated a federal regulation enacted pursuant to the Federal Railroad Safety Act (the “FRSA” or the “Act”), which “require[s] that CSX manage and control the stormwater occurring on its property.” (Supplemental App. at 90.) That regulation provides that “[e]ach drainage or other water carrying facility under or immediately adjacent to the roadbed shall be maintained and kept free of obstruction, to accommodate expected water flow for the area concerned.” 49 C.F.R. 213.33. MD Mall argued that § 213.33 imposed on CSX a duty to ensure that the earthen berm system that was designed to prevent water from flowing onto the Mall property is properly maintained. (Supplemental App. at 90.) Given the erosion of the berm and the consequent flooding, MD Mall continued, “CSX is clearly not accommodating the expected water flow from its property, as required under Section 213.33.”[3] (Supplemental App. at 90.) As relief, MD Mall requested that “CSX be ordered to control and manage the water run-off occurring on its property pursuant to a full engineering plan.” (Supplemental App. at 91.)
*485 Despite invoking § 213.33, MD Mall asserted that its claims were not preempted by the FRSA, even though that. Act expressly provides that “[a] state may adopt or continue in force a law, regulation, or order related to railroad safety ... until the Secretary of Transportation (with respect to railroad safety matters) ... prescribes a regulation or issues an order covering the subject matter of the State requirement.” 49 U.S.C. § 20106(a)(2). In support of its position, MD Mall cited a 2007 amendment to that preemption provision, which serves as a “[clarification regarding State law causes of action.” 49 U.S.C. § 20106 (the “Clarification Amendment” or the “Amendment”). The Clarification Amendment provides that “[n]oth-ing in [the FRSA] shall be construed to preempt an action under State law seeking damages for personal injury, death, or property damage alleging that a party ... has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation.” Id. MD Mall argued that, under the Amendment, its claims were - not preempted.
The District Court saw things differently. It granted CSX’s cross-motion for summary judgment, holding that MD Mali’s claims were blocked by the express preemption provision of the FRSA. Because MD Mall had asserted that CSX was in violation of § 213.33, the District Court held that MD Mall had “implicitly ac-knowledgefd]” that the regulation is applicable to its claims (App. at 7), and the Court then determined that the claims were preempted.[4]
The District Court rejected MD Mali’s argument that its negligence and continuing storm water trespass claims were subject to the Clarification Amendment. While state law actions are permitted to proceed when they allege a failure to comply with a federal standard of care, the Court held that the Amendment is limited to cases “ ‘seeking damages for personal injury, death, or property damage.’ ” (App. at 8 (quoting 49 U.S.C. § 20106(b)(1)).) Because MD Mall “appears to have disavowed any claim for damages and is instead seeking only equitable relief,” the Court determined that the Amendment did not apply.[5] (App. at 8.)
MD Mall then filed this timely appeal.
II. Discussion[6]
A. Waiver and Judicial Estoppel
MD Mall has now discarded its previous position that § 213.33 sets the *486 pertinent standard for measuring CSX’s liability. It argues instead that the regulation “[does] not even relate to, let alone cover, a railroad’s discharge of stormwater onto an adjoining property.” (MD Mali’s Opening- Br. at 11.) Because MD Mall raises that argument for the first time on appeal, CSX asserts that we should not consider it, as MD Mall either waived it or is judicially estopped from raising it now. We thus begin by addressing waiver and estoppel.
1. Waiver
Arguments that are “asserted for the first time on appeal are deemed to be waived and consequently are not susceptible to review ... absent exceptional circumstances.” Birdman v. Office of the Governor, 677 F.3d 167, 173 (3d Cir.2012) (internal quotation marks omitted). However, “[w]hile waiver ordinarily bars raising new arguments for the first time on appeal, this rule is one of discretion rather than jurisdiction, and it may be relaxed whenever the public interest so warrants.” Barefoot Architect, Inc. v. Bunge, 632 F.3d 822, 834-35 (3d Cir.2011) (alteration, citations, and internal quotation marks omitted); see also Webb v. City of Phila., 562 F.3d 256, 263 (3d Cir.2009) (waiver rule may be relaxed “where the issue’s resolution is of public importance” (internal quotation marks omitted)). CSX acknowledges that this case is of public importance; it argues that MD Mall’s claims, if allowed, could subject it and other railroads to similar claims by myriad, other landowners with property near railroad tracks. Conversely, if MD Mall’s claims are preempted, property owners may have no remedy for the discharge of storm water onto their land by a neighboring railroad. Either way, MD Mall’s claims are of public importance, and we accordingly decline to apply the general rule of waiver in this case.
2. Judicial Estoppel
CSX also contends that MD Mall is judicially estopped from claiming that § 213.33 does not cover its claims. “Judicial estoppel is a judge-made doctrine that seeks to prevent a litigant from asserting a position inconsistent with one that [it] has previously asserted in the same or in a previous proceeding.” Macfarlan v. Ivy Hill SNF, LLC, 675 F.3d 266, 272 (3d Cir.2012) (internal quotation marks omitted). “The doctrine exists to protect the integrity of the judicial process and to prohibit parties from deliberately changing positions according to the exigencies of the moment.” Id. (internal quotation marks omitted). That said, “we have consistently stated that the doctrine should only be applied to avoid a miscarriage of justice.” Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp., 337 F.3d 314, 319 (3d Cir.2003).
“[T]hree factors inform a federal court’s decision whether to apply” judicial estoppel: “there must be (1) irreconcilably inconsistent positions; (2) adopted in bad faith; and (3) a showing that estoppel addresses the harm and no lesser sanction is sufficient.” G-I Holdings, Inc. v. Reliance Ins. Co., 586 F.3d 247, 262 (3d Cir.2009) (alterations and internal quotation marks omitted). However, “judicial estoppel is generally not appropriate where the defending party did not convince the District Court to accept its earlier position.” Id. CSX insists that MD Mall did convince the Court to accept its earlier position, because “the court did accept the Mali’s ‘implicit! ] acknowledgement]’ that ‘the drain *487 age regulation ‘covers’ the subject of drainage’ in the areas implicated by this case.” (CSX’s Br. at 22 (quoting App. at 7).)
As MD Mall correctly points out, however, the District Court’s citation of MD Mall’s acknowledgment that § 213.33 covers its claims does not rise to the level of reliance necessary to trigger judicial estoppel. Before determining that judicial estoppel bars relief, “courts regularly inquire whether the party has succeeded in persuading a court to accept that party’s earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled.” New Hampshire v. Maine, 532 U.S. 742, 750, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (internal quotation marks omitted). Because judicial estoppel “generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase,” id. at 749, 121 S.Ct. 1808 (internal quotation marks omitted), “[ajbsent success in a prior proceeding, a party’s later inconsistent position introduces no risk of inconsistent court determinations and thus poses little threat to judicial integrity,” id. at 750-51, 121 S.Ct. 1808 (citation and internal quotation marks omitted).
Judicial estoppel thus does not apply here because MD Mall did not obtain a benefit from the arguments it made in the District Court. The arguments it made did not prevail in any meaningful sense. The District Court instead granted summary judgment to CSX. In the decisions that CSX cites to support its judicial estop-pel argument, by contrast, judicial estoppel was found to bar relief because each es-topped party had obtained an unfair litigation benefit as a result of its prior contradictory position. See New Hampshire, 532 U.S. at 751-52, 121 S.Ct. 1808 (state barred from changing the location of a boundary to which it had agreed in a prior consent order approved by the court); Macfarlan, 675 F.3d at 273-74 (plaintiff barred from seeking reinstatement to his former job when he had accepted.disability benefits based on a purported inability to work); Krystal, 337 F.3d at 320 (debtor estopped from asserting, claim which he failed reveal to creditors so as to keep the recovery on the claim for himself). The doctrine of judicial estoppel “should only be applied to avoid a miscarriage of justice.” Krystal, 337 F.3d at 319. In this case, MD Mall did not benefit from its inconsistent position in the District Court, and no miscarriage of justice would result from our entertaining the argument it now advances on appeal. Thus, while we have no desire to encourage the kind of head-snapping inconsistency manifested in MD Mall’s arguments, we decline to treat its new argument as judicially estopped.
B. Express Preemption Under the FRSA
As already noted, the FRSA provides that a state “law, regulation, or order related to railroad safety” shall be preempted by a regulation or order issued by “the Secretary of Transportation (with respect to railroad safety matters)” that “cover[s] the subject matter of the State requirement.” 49 U.S.C. § 20106(a)(2). Pursuant to the previously described 2007 Clarification Amendment to that express preemption provision, even though a federal regulation “covers” a state law related to railroad safety, a plaintiff may still bring claims “seeking damages for personal injury, death, or property damage” when the plaintiff “alleg[es] that a party ... has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of *488 Transportation.” Id. § 20106(b)(A) (2007).
In Zimmerman v. Norfolk Southern Corp., 706 F.3d 170 (3d Cir.2013), we explained that, under the Clarification Amendment, “claimants can avoid preemption by alleging a violation of either a ‘Federal standard of care’ or the railroad’s ‘own plan, rule, or standard that it created pursuant to a regulation or order.’ ” Id. at 177 (quoting 49 U.S.C. § 20106(b)(1)(A)-(B)). The Amendment “restricts preemption in some respects,” id., by clarifying that a claim is permitted when the allegation is that the railroad did not comply with the standard established by a federal regulation (traveling at 90 m.p.h., for example, despite a regulation limiting train speeds to 60 m.p.h.), “even when [the] regulation covers the subject matter of [the] claim,’-’ id. The Clarification Amendment also “preserves cases interpreting the phrase ‘covering the subject matter of the State requirement,’ ” so that the well-developed law indulging a presumption against preemption, as further described herein, remains intact. Id. (quoting 49 U.S.C. § 20106(a)(2)).
Zimmerman calls for us to follow a two-step process: “We first ask whether the defendant allegedly violated either a federal standard of care or an internal rule that was created pursuant to a federal regulation.” Id. at 178. If so, as was the case in Zimmerman, “the plaintiffs claim avoids preemption.” Id. (citing 49 U.S.C. § 20106(b)(1)(A)-(B)). If not, we ask the second question, which is “whether any federal regulation covers the plaintiffs claim.” Id. (citing 49 U.S.C. § 20106(a)(2)).[7]
This case is different from Zimmerman in that, on appeal, MD Mall has abandoned the argument that CSX violated a federal standard of care and instead insists that the pertinent federal regulation, § 213.33, does not cover a storm water discharge dispute of the type before us now.. (MD Mall’s Opening Br. at 11.) Thus, MD Mali’s claims are only preserved from preemption if no federal regulation enacted pursuant to the FRSA “cover[s] the subject matter [i.e. storm water runoff] of the State requirement.” 49 U.S.C. § 20106(a)(2).[8]
*489 When interpreting the FRSA’s preemption provisions, we apply a general “presumption against preemption.” Bruesewitz v. Wyeth Inc., 561 F.3d 233, 240 (3d Cir.2009). “In areas of traditional state regulation, we assume that a federal statute has not supplanted state law unless Congress has made such an intention ‘clear and manifest.’ ” Bates v. Dow Agrosciences, LLC, 544 U.S. 431, 449, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005) (internal quotation marks omitted). “The presumption is relevant even when there is . an express pre-emption clause. That is because ‘when, the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily accept the reading that disfavors pre-emption.’ Thus, the presumption operates both to prevent and to limit preemption.” Franks Inv. Co. v. Union Pacific R.R. Co., 593 F.3d 404, 407 (5th Cir.2010) (quoting Altria Grp., Inc. v. Good, 555 U.S. 70, 77, 129 S.Ct. 538, 172 L.Ed.2d 398 (2008)) (internal quotation marks omitted); see also N.Y. Susquehanna & W. Ry. Corp. v. Jackson, 500 F.3d 238, 252 (3d Cir.2007) (“[A] federal law does not preempt state laws where the activity regulated by the state is merely a peripheral concern of the federal law....” (alteration and internal quotation marks omitted)). In the end, preemption applies only if it “is the clear and manifest purpose of Congress” in enacting the law in question, CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993) (internal quotation marks omitted), because “the purpose of Congress is the ultimate touchstone in every preemption case,” Wyeth v. Levine, 555 U.S. 555, 565, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009) (internal quotation marks omitted).
Beyond those general principles, the Supreme Court has determined that the FRSA’s preemption provision “displays considerable solicitude for state law.” *490 Easterwood, 507 U.S. at 665, 113 S.Ct. 1732. For example, Congress enacted the FRSA “to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents,” 49 U.S.C. § 20101, and the Secretary of Transportation has authority to “prescribe regulations and issue orders for every area of railroad safety,” id. § 20103(a), but the preemptive effect of the statute reaches only state laws “covered” by the statute’s implementing regulations. Id. § 20106(a)(2). Because the term “cover” is a “restrictive term,” preemption will not apply if the FRSA regulation in question merely “touch[es] upon or relate[s] to” the subject matter of state law. Easterwood, 507 U.S. at 664, 113 S.Ct. 1732 (internal quotation marks omitted). Rather, “pre-emption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law.” Id.
We accordingly held in Strozyk v. Norfolk Southern Corp., 358 F.3d 268 (3d Cir. 2004), that a regulation’s “bare mention of ... limited visibility ... does not indicate an intent to regulate [that] condition[ ],” and that a suit against a railroad alleging a condition of poor visibility at a railroad crossing was not preempted. Id. at 273. Other courts have likewise concluded that a federal regulation dictating that “[vegetation on railroad property which is on or immediately adjacent to [the] roadbed shall be controlled so that it does not ... [o]bstruct visibility of railroad signs and signals,” 49 C.F.R. § 213.37(b), serves to “preempt[ ] any state-law claim regarding vegetative growth that blocks a sign immediately adjacent to a crossing, but it does not impose a broader duty [under federal law] to control vegetation so that it does not obstruct a motorist’s visibility of oncoming trains.” Shanklin v. Norfolk S. Ry. Co., 369 F.3d 978, 987 (6th Cir.2004) (internal quotation marks omitted). Thus a state law claim is not preempted if it alleges negligence in allowing vegetation to obscure safe lines of sight at a railroad crossing. See, e.g., Peters v. Union Pac. R.R. Co., 455 F.Supp.2d 998, 1003 (W.D.Mo.2006) (vegetation in crossing and right-of-way were not areas on or immediately adjacent to tracks and therefore claims that they obstructed sight lines were not preempted under the FRSA); Murrell v. Union Pac. R.R. Co., 544 F.Supp.2d 1138, 1154 (D.Or.2008) (claims for failing to provide adequate visibility not preempted under the FRSA); Anderson v. Wis. Cent. Transp. Co., 327 F.Supp.2d 969, 979-80 (E.D.Wis.2004) (claims of vegetation beyond the roadbed or immediately adjacent to it not preempted); cf. Rushing v. Kansas City S. Ry. Co., 185 F.3d 496, 516 (5th Cir.1999) (sound capacity safety regulation addresses only the sound-producing capacity of the whistles and does not substantially subsume regulations on when whistles are sounded); Bradford v. Union Pac. R.R. Co., 491 F.Supp.2d 831, 838-39 (W.D.Ark.2007) (failure to keep proper lookout and crew fatigue not preempted because regulations merely touched upon the subject and did not subsume them).
CSX argues that § 213.33, which by its terms requires that a railroad’s drainage facilities “under or immediately adjacent to” the track “be maintained and kept free of obstruction,” 49 C.F.R. § 213.33, preempts Pennsylvania law governing storm water runoff. As the railroad sees it, MD Mali’s claims ipust be dismissed because § 213.33 “cover[s] the subject of drainage under and around the tracks — and therefore preempts] the Mall’s claims, which concern precisely the same topic.”[9] (CSX’s Br. at 18.) Al *491 though it has acknowledged that the limited purpose of § 213.33 “is to keep water away from the tracks, that’s it” (Supplemental App. at 133), CSX has nevertheless taken the aggressive position that the railroad is thereby permitted to channel its rainwater onto a neighboring property. (See, e.g., Supplemental App. at 131 (“The railroad can do whatever it needs to do to keep water away .... ”)); id. at 133 (“[Section 213.33] doesn’t say, you can’t put it on your — your neighbor’s land, it doesn’t say anything, it just says, keep it away from the tracks.”).
We reject that conclusion. First, to the extent CSX is saying that, as long as a regulation involves the same general topic as a plaintiffs claim, such as water drainage, the regulation “covers” that claim, the argument is at odds with Supreme Court precedent. A regulation must do more than “touch upon or relate to [the] subject matter” of a state law claim; it must “substantially subsume” it. Easterwood, 507 U.S. at 664, 113 S.Ct. 1732. The railroad’s argument for preemption here has even less to recommend it than the argument that a regulation requiring vegetation to be trimmed away from signs preempted a claim that overgrown vegetation created an unsafe crossing. See supra at 18-19. We cannot read the silence of § 213.33 on a railroad’s duties to its neighbors when addressing track drainage as an express abrogation of state storm water trespass law. Given that the FRSA provides no express authorization for disposing of drainage onto an adjoining property, the presumption must be that state laws regulating such action survive, see Easterwood, 507 U.S. at 668,113 S.Ct. 1732 (noting that preemption is improper when “the regulations provide no affirmative indication of their effect on negligence law” (emphasis added)).
Second, the type of harm sought to be avoided by § 213.33 is wholly different than the harm alleged by MD Mall. Several courts interpreting the Federal Employers Liability Act (“FELA”), 45 U.S.C. §§ 51-60, which protects railroad employees from railroad negligence,[10] have held that “whether compliance with applicable FRSA safety regulations precludes a finding that a railroad has been negligent” depends in large part on whether the regu *492 lations in question “directly address[ ] the type of harm that ultimately resulted.” Cowden v. BNSF Ry. Co., 738 F.Supp.2d 932, 937 (E.D.Mo.2010) rev’d on other grounds, 690 F.3d 884, 893-94 (8th Cir. 2012) (reversing as premature the grant of summary judgment because the district court had raised FRSA regulations for the first time sua sponte. and did not give plaintiff an opportunity to ‘submit[] evidence of FRSA violations’ or to separately evaluate whether railroad breached duty imposed by FRSA); see also Kansas City S. Ry. Co. v. Nichols Constr. Co., 574 F.Supp.2d 590, 599 (E.D.La.2008) (“[T]he types of dangers and precautions contemplated by a railroad safety regulation are determinative of whether or not a railroad’s compliance with regulations will shield it from liability.”). If the regulations do address the type of harm alleged, “the compliance with [those] regulation^] will preclude a finding of liability....” Cowden, 738 F.Supp.2d at 937. On the other hand, if a plaintiffs injuries “come about in a way not contemplated by a safety regulation, then the railroad’s compliance with that regulation might not preclude its having failed to exercise a reasonable standard of care.” Nichols Constr., 574 F.Supp.2d at 599. “Numerous courts have applied this general principle in finding that a given FRSA regulation was or was not intended to prevent the harm the plaintiff suffered, and that the defendant railroad’s duty of care accordingly was or was not subsumed by the regulation.” Cowden, 738 F.Supp.2d at 938. Compare Lane v. R.A. Sims, Jr., Inc., 241 F.3d 439, 443 (5th Cir.2001) (excessive-speed claim precluded by FRSA regulations concerning speed limits), with Tufariello v. Long Island R.R. Co., 458 F.3d 80, 86 (2d Cir. 2006) (holding that a railroad employee could bring a negligence claim against his employer for hearing loss resulting from long-term exposure to train horns because no FRSA preclusion existed, as the FRSA only prescribed minimum sound levels for warning devices on trains).
Section 213.33 is, by CSX’s own admission, plainly intended to prevent water from pooling on or around railroad tracks and thus to avoid potentially dangerous conditions occasioned by standing water, such as the presence of debris on tracks, icing conditions, and compromised track integrity. There is no indication whatsoever that it was intended to address storm water discharge onto a neighboring property, which is the harm alleged by MD Mall.[11] Again, CSX pressed its understand *493 ing of § 213.33 at oral argument in the District Court, saying that § 213.33 “is a drainage regulation” that “essentially” tells railroads “to keep the water off the tracks because it’s dangerous to have water there, because it will deteriorate the track.” (Supplemental App. at 133.) CSX represented that “the intent of’ the drainage regulation “is to keep water away from the tracks, that’s it.” (Supplemental'App. at 133.) It is accordingly difficult to conclude that § 213.33 “was ... intended to prevent the harm plaintiff suffered,” ie., storm water trespass, or “that the defendant railroad’s duty of care” with respect to state storm water trespass law was “subsumed by the regulation.” Cowden, 738 F.Supp.2d at 938 (citations omitted).
Finally, the position advocated by CSX — that because § 213.33 does not prohibit storm water discharge onto adjoining property it therefore permits it — is troubling because, as the Tenth Circuit said in Emerson v. Kansas City Southern Railway Co., 503 F.3d 1126 (10th Cir.2007), it “has no obvious limit, and[,] if adopted,” could “lead to absurd results.” Id. at; 1132. Although Emerson interpreted a question of preemption under the Interstate Commerce Commission Termination Act (the “ICCTA”), the Tenth Circuit’s observations about the limitless and absurd results occasioned by an expansive interpretation of an express preemption provision are pertinent here, especially in light of the FRSA’s solicitude for state law. See Easterwood, 507 U.S. at 664, 113 S.Ct. 1732 *494 (noting that the FRSA’s preemption provision “displays considerable solicitude for state law”).
The plaintiffs in Emerson alleged that, when the defendant railroad replaced old, deteriorated rail ties, it “regularly discarded” the ties in a nearby drainage ditch. Emerson, 503 F.3d at 1128. The ditch consequently became clogged, and the plaintiffs’ property flooded. Id. The railroad argued that subjecting it to liability for discarding old rail ties would interfere with the ICCTA, which provides that “remedies ... with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.” 49 U.S.C. § 10501(b). The court rejected that argument, reasoning that “[i]f the ICCTA preempts a claim stemming from improperly dumped railroad ties, it is not a stretch to say that the Railroad could dispose of a dilapidated engine in the middle of Main Street — a cheap way to be rid of an unwanted rail car.” Emerson, 503 F.3d at 1132. “After all,” the court continued, “in this hypothetical .'.. the Railroad is merely disposing of unneeded railroad equipment in a cost-conscious fashion. Our holding [rejecting the railroad’s demand for sweeping preemption] ... interprets the ICCTA’s preemption clause such that this absurd result is avoided.” Id.
In line with that persuasive reasoning, we must take a sensible view of the FRSA’s preemption provision, avoiding the carte blanche ruling the railroad ■ seeks. Longstanding state tort and property laws exist for a reason, and the FRSA’s laudatory safety purpose should not be used as a cover to casually cast them aside. See Easterwood, 507 U.S. at 668, 113 S.Ct. 1732 (noting that preemption is improper when “the regulations provide no affirmative indication of their effect on negligence law”). . For if CSX is free to negligently discharge its storm water onto its neighbor’s property, why should it not be allowed to do so intentionally? It might simplify CSX’s duties under § 213.33 if it could simply install drainage pipes that empty directly onto adjoining properties. Judging by the testimony of CSX’s road master, who stated that CSX’s sole concern when conducting the 2009 track refurbishment was to ensure that storm water drained away from the track and that it was not concerned about storm water discharging onto the adjoining property, and given CSX’s argument in the District Court that § 213.33 allows a “railroad [to] do whatever it needs to do to keep water away” from the railroad track, including directing it onto a neighbor’s .property (Supplemental App. at 131, 133), and further given the attempt by the railroad in this case to build a spillway emptying directly into the Mall’s storm drain, CSX’s position is not far removed from that extreme. The constrained scope given to the FRSA’s preemption provision by the Supreme Court in Easterwood cannot support such an understanding of § 213.33.[12]
*495 Accordingly, we hold that the FRSA’s express preemption provision does not apply to MD Mali’s claims.
C. Implied Conflict Preemption
Even though the FRSA’s express preemption provision does not operate to extinguish MD Mall’s claims, the present lawsuit may be “pre-empted by implication because the state-law principle [it] seek[s] to vindicate would conflict with federal law.” Freightliner Corp. v. Myrick, 514 U.S. 280, 287, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995).[13] A court may find implied conflict pre-emption “where it is impossible for a private party to comply with both state and federal law,” Crosby v. Nat’l Foreign Trade Council, 530 U.S. 363, 373, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000), or “where under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.” Id. (alterations and internal quotation" marks omitted). “What is a sufficient obstacle is a matter of judgment, to be informed- by examining the federal statute [or regulation] as a whole and identifying its purpose and intended effects.... ” Id. “The mere fact of ‘tension’ between federal and state law is generally not enough to establish an obstacle supporting preemption, particularly when the state law involves the exercise of traditional police power.” Madeira v. Affordable Housing Found., Inc., 469 F.3d 219, 241 (2d Cir.2006). Rather, “[t]he principle is thoroughly established that the exercise by the state of its police power, which would be valid if not superseded by federal action, is superseded only where the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together.” Jones v. Rath Packing Co., 430 U.S. 519, 544, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977) (Rehnquist, J., concurring in part and dissenting in part) (quoting Kelly v. Washington, 302 U.S. 1, 10, 58 S.Ct. 87, 82 L.Ed. 3 (1937)) (internal quotation marks omitted).
Conflict preemption thus embraces two distinct situations. In the easier' but rarer case, compliance with both federal and state duties is simply impossible. See, e.g., Southland Corp. v. Keating, 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984) (state law requiring judicial determination of certain claims preempted by federal law requiring arbitration of those claims). In the second and more common situation, compliance with both laws is possible, yet state law poses an obstacle to the full achievement of federal purposes.
We can confidently conclude that this case is not of the former variety. As CSX’s engineers suggested when studying the breakdown of the berm, the runoff problem -is remediable, though at some cost to the company, and it is therefore not impossible for CSX to comply both with *496 Pennsylvania storm water trespass law and § 213.33. It would indeed be odd to conclude that dual compliance is not possible given that CSX successfully did just that for a number of decades without difficulty.
We are less confident, however, in saying that Pennsylvania law does not, “under the circumstances of [this] particular case, ... stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.” Crosby, 530 U.S. at 373, 120 S.Ct. 2288 (internal quotation marks omitted). We do not know, because the District Court made no findings of fact, whether and to what extent, if any, Pennsylvania law stands as an obstacle to the accomplishment and execution of § 213.33’s railroad safety purpose. Whether CSX can employ reasonable means to comply with § 213.33’s drainage requirements in this specific case while also complying with Pennsylvania law regarding storm water trespass is a question of fact. See Arizona v. United States, — U.S.-, 132 S.Ct. 2492, 2515, 183 L.Ed.2d 351 (2012) (Scalia, J., concurring in part and dissenting in part) (arguing that “[i]t is impossible” to “ ‘determine whether, under the circumstances of this particular case, [the State’s] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,” without “a factual record concerning the manner in which Arizona is implementing” state law); James T. O’Reilly, Federal Preemption of State and Local Law: Legislation, Regulation and Litigation 72 (2006) (stating that conflict preemption analysis “requires ... attention to the facts of each case”).
It may be that, in the maintenance of the drainage facilities that are under and immediately adjacent to the portion of the track in question, CSX is unable, through reasonable means, to prevent the flow of storm water onto MD Mall’s property. Again, since the railroad managed for years to deal with its drainage without affecting the Mall, one wonders how it can have become an unreasonable burden now, but we have virtually no factual record on the issue and so cannot definitively address it. The District Court is in a better position to make the necessary factual inquiry, and we will therefore remand for the development of an appropriate record.[14]
*497 III. Conclusion
For the foregoing reasons, we will vacate the District Court’s order granting summary judgment in CSX’s favor, and will remand the case for further proceedings consistent with this opinion.

. In accordance with our standard of review, see infra note 6, we set forth the facts in the light most favorable to MD Mall. See Gonzalez v. Sec’y of Dep’t of Homeland Sec., 678 F.3d 254, 257 (3d Cir.2012) (“When reviewing a grant of summary judgment the court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party’s favor.” (internal quotation marks omitted)).

. MD Mall also brought a separate trespass claim (Count III) against CSX for entering the Mali’s property without permission to build the concrete spillway on the Mall’s side of the berm. After the District Court granted summary judgment to CSX on Counts I and II but denied summary judgment on Count III, MD Mall withdrew Count III.

. See also MD Mali's Supplemental Mem. in Opp’n to CSX’s Motion for Summ. J. at 6 (arguing that the "clear mandate” of § 213.33 is that CSX must "manage the stormwater on its property so that it is not discharged on to the Mall property in a concentrated and increased way").

. The District Court mentioned that another regulation, 49 C.F.R. § 213.103, relates to MD Mali’s claims. Section 213.103 requires railroad tracks to be supported by material that will, among other things, "[p]rovide adequate drainage for the track.” Id. § 213.103(c).

. Because the District Court concluded that MD Mall's claims were preempted by the FRSA, it declined to address CSX’s alternative argument that the claims were preempted by the Interstate Commerce Commission Termination Act (the "ICCTA”). It also declined to evaluate the underlying substantive merits of MD Mall's state law negligence and storm water trespass claims.

.The District Court had jurisdiction under 28 U.S.C. § 1332, and we have jurisdiction under 28 U.S.C. § 1291. We "review [the] District Court's grant of summary judgment de novo, applying the same standard the District Court applied.” Gonzalez v. Sec’y of Dep't of Homeland Sec., 678 F.3d 254, 257 (3d Cir. 2012) (internal quotation .marks omitted). Summary judgment is proper only where the pleadings, discovery, and non-conclusory affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. Proc. 56(c). As earlier noted, supra note 1, when reviewing a grant of summary judgment we "must view the facts in the light *486 most favorable to the nonmoving party,” in this case MD Mall, "and draw all inferences in that party's favor.” Gonzalez, 678 F.3d at 257 (internal quotation marks omitted).

. The universe of possible claims can be thought of as fitting within three categories: first, those, like the ones in Zimmerman, that depend upon the breach of a standard set by federal law (or adopted by a railroad from federal law) as the basis of liability and are thus not preempted; second, those that depend on state law as the basis for liability but which are preempted because there is an applicable FRSA regulation that entirely covers the plaintiff's claim; and, third, those that depend on state law and are not preempted because there is no such regulation. The first Zimmerman question seeks to discover which claims fall within the first category, and the second Zimmerman question brings to light the claims that fall within the latter two categories.

. Although MD Mall has abandoned its argument under the Clarification Amendment and we therefore need not evaluate whether the Amendment applies here, it did argue in the District Court, as already described, that § 213.33 “require[s] that CSX manage and control the stormwater occurring on its property” (Supplemental App. at 90), and that CSX breached that duty through negligence during the 2009 track refurbishment. It said that it was therefore authorized to bring[1] suit under the Clarification Amendment. The District Court held, however, that the Clarification Amendment only saves from preemption state law actions that "seek[] damages for personal injury, death, or property damage.” 49 U.S.C. § 20106(b)(1). The Court read the Amendment’s silence on equitable relief as precluding MD Mali's request for an injunction. That conclusion is open to question.
The Clarification Amendment was a pinpoint piece of legislation meant to overturn federal court decisions in the so-called "Minot Derailment Cases.” Those cases, which involved the horrifying derailment near Minot, *489 North Dakota, of tank cars carrying toxic chemicals, interpreted the FRSA to preempt claims for damages, even when a plaintiff alleged that a railroad violated federal regulations or its own internal rules. See Lundeen v. Canadian Pac. Ry. Co., 507 F.Supp.2d 1006, 1009 (D.Minn.2007); Mehl v. Canadian Pac. Ry., Ltd., 417 F.Supp.2d 1104, 1106 (D.N.D. 2006). According to its legislative history, the Amendment was intended to "clarify the intent and interpretations of the existing preemption statute and to rectify the Federal court decisions related to the Minot, North Dakota accident that are in conflict with precedent.” H.R.Rep. No. 110-259, at 351, 120 Cong. Rec. H8589 (2007), U.S.Code Cong. & Admin. News 2007, p. 119 (emphasis added). To further hammer home its dissatisfaction with the Minot Derailment Cases, Congress applied the Amendment to "all pending State law causes of action arising from activities or events occurring on or after January 18, 2002,” the exact date of the Minot derailment. Id.; see also Henning v. Union Pac. R.R. Co., 530 F.3d 1206, 1214 (10th Cir.2008) (noting that Congress enacted the Amendment to rectify Minot Derailment Cases); Kurns v. Chesterton, No. 08-2216, 2009 WL 249769, at *5 (E.D.Pa. Feb. 3, 2009) ("[T]he amendments were clearly directed at the Minot, North Dakota, train derailment occurring on January 18, 2002.”).
Aimed as it was at the specific difficulty Congress perceived in the Minot Derailment Cases, the Clarification Amendment speaks only about claims for damages, but that does not mean that suits for injunctive relief are beyond its clarifying effect. Congress used the word "clarification,” which "indicates [it] sought to resolve an ambiguity rather than effect a substantive change” in railroad liability under the FRSA. Henning, 530 F.3d at 1216. Accordingly, the Clarification Amendment indicates that “a state law cause of action is not preempted when it is based on an allegation that a party failed to comply with a federal standard of care established by regulation or failed to comply with its own plan, rule or standard created pursuant to a federal regulation.” Gauthier v. Union Pac. R.R. Co., 644 F.Supp.2d 824, 835 (E.D.Tex. 2009). A reading of the Clarification Amendment that leaves claims for injunctive relief preempted is not something we need to address now, but we note some difficulty with the District Court’s reasoning.

. CSX also asserts that 49 C.F.R. § 213.103(c), which requires railroads to use *491 ballast that "[p]rovide[s] adequate drainage for the track” (see supra n. 4), serves with § 213.33 to "cover the subject of drainage under and around the tracks.” (CSX’s Br. at 27-28.) The railroad provides no argument, however, for how § 213.103 subsumes state storm water trespass law other than as a tag-along to § 213.33. We therefore confine our analysis to CSX's arguments regarding § 213.33.

. Although FELA is a federal statute and federal preemption "is inapplicable to a potential conflict between two federal statutes,” Tufariello v. Long Island R.R. Co., 458 F.3d 80, 86 (2d Cir.2006), there is a general consensus that "the uniformity demanded by the FRSA ‘can be achieved only if [FRSA regulations] are applied similarly to a FELA plaintiff's negligence claim and a non-railroad-employee plaintiff's state law negligence claim.' " Nickels v. Grand Trunk W. R.R., Inc., 560 F.3d 426, 430 (6th Cir.2009) (quoting Lane v. R.A. Sims, Jr., Inc., 241 F.3d 439, 443 (5th Cir.2001)); see also id. ("Dissimilar treatment of the claims would have the untenable result of making the railroad safety regulations established under the FRSA virtually meaningless: The railroad could at one time be in compliance with federal railroad safety standards with respect to certain classes of plaintiffs yet be found negligent under the FELA with respect to other classes of plaintiffs for the very same conduct.” (internal quotation marks omitted)). As a result, courts apply the principles distilled by Easter-wood and its progeny in determining whether a claim under FELA is substantially subsumed, and therefore precluded, by railroad safety regulations enacted pursuant to the FRSA, and we accordingly apply the reasoning of the FELA cases by analogy.

. The dissent claims that, in looking to the type of harm sought to be avoided by an FRSA regulation, we are flouting Easter-wood' s "unequivocal instruction” that, "in determining the preemptive effect of a regulation, the only question is whether the regulation covers the subject matter.” (Dissent Op. at 499 (citing Easterwood, 507 U.S. at 664, 113 S.Ct. 1732).) As proof, the dissent points to a statement in Easterwood, made with reference to an FRSA regulation governing train speed, that the FRSA's preemption provision "does not ... call for an inquiry into the Secretary’s purposes, but instead directs the courts to determine whether regulations have been adopted that in fact cover the subject matter of train speed.” Easterwood, 507 U.S. at 675, 113 S.Ct. 1732. By looking to the purpose behind an FRSA regulation, the dissent insists, "we divert our attention from the ‘coverage’ of [§ 213.33],” and "we disregard the preemption analysis required under East-erwood." (Dissent Op. at 499.)
Our colleague’s reading of Easterwood is out of context. When the Supreme Court made that statement, it had already established that the train speed regulation in question "should be understood as covering the subject matter of train speed with respect to track conditions, including the conditions posed by grade crossings.” Easterwood, 507 U.S. at 675, 113 S.Ct. 1732. In other words, the harm sought to be avoided by the relevant regulation was the danger posed by fast moving trains. The plaintiff below "nevertheless maintain[ed] that pre-emption is inappropri *493 ate because the Secretary’s primary purpose in enacting the speed limits was not to ensure safety at grade crossings, but rather to prevent derailments.” Id. Having already determined that the regulation covered “train speed” with respect to, among other' things, "conditions posed by grade crossings,” the Court saw no justification for delving into the relative weight of the particular railroad safety concerns the -Secretary had in mind when promulgating the regulation. Id.
Our dissenting colleague counters that ”[t]he nature of the harm [addressed by a regulation] is ... irrelevant in determining ‘coverage.’ ” (Dissent Op. at 499 n. 7.) That, however, denies that the purpose of a regulation bears on its scope. We see nothing in Easterwood to support that extraordinary claim, which is contrary to ordinary rules of construction, in general, see Crandon v. United States, 494 U.S. 152, 158, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990) ("In determining the meaning of [a] statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy.”), and to well-settled rules for evaluating the preemptive scope of federal statutes and regulations, in particular, see Altria Grp., 555 U.S. at 76, 129 S.Ct. 538 (“Our inquiry into the scope of a statute's pre-emp-tive effect is guided by the rule that the purpose of Congress is the ultimate touchstone in every pre-emption case.” (alteration and internal quotation marks omitted)).
An analogy to § 213.33 brings clarity to the matter. Section 213.33 seeks to prevent harms associated with water pooling on or around railroad tracks — harms such as icing conditions, compromised track integrity, a greater likelihood of dangerous obstructions occasioned by standing water, and the like. An allegation that such conditions led to an accident would be "covered” by § 213.33, regardless of whether the actual harm caused by the alleged condition was great (e.g. a train derailment) or relatively small (e.g. a slip and fall). Whether the Secretary had train derailments foremost in mind in promulgating § 213.33 is irrelevant, in other words, because the regulation seeks generally to avoid harms caused by an inadequately drained track.
Related as it is to railroad safety — as it must be under 49 U.S.C. § 20106(a)(2) — § 213.33 does not seek to avoid the harms associated with a railroad’s discharge of storm water onto an adjoining property. Whether the railroad disposes of its runoff by channeling it to the public storm water system or to its neighbor's property is irrelevant to the regulation’s railroad safety.purpose. And given that the regulation and the FRSA do not otherwise relieve railroads of their state law duties to their neighbors we are reluctant to hold that § 213.33 “covers” MD Mali's storm water discharge claims.

. The dissent characterizes our analysis as holding that, “even if [the] FRSA clearly covers the conduct of a railroad, such that the matter is preempted undér Easterwood, a claimant could, nonetheless, assert a claim for any resulting or consequential injury that flows from the covered conduct.” (Dissent Op. at 498.) Viewing our analysis in that way, the dissent claims that we “gut ... preemption analysis” and “turn[] preemption on its head,” which "will bring about needless confusion in our jurisprudence as to the proper preemption analysis.” (Id. at 500.) Our opinion here does no such thing. When a regulation covers (in that it substantially subsumes) a plaintiffs state law claims, the FRSA applies, and the suit will be preempted, assuming the Clarification Amendment does not revive it. Our conclusion is that § 213.33, which requires railroads to maintain systems that adequately drain water away from the track, does not substantially subsume MD *495 Mali's claims regarding water discharge onto their property, not that MD Mall's claims may proceed even though § 213.33 covers its claims.

. The Court in Myrick rejected "the argument that [it] need not reach the conflict preemption issue at all” because “implied preemption cannot exist when Congress has chosen to include an express pre-emption clause in a statute.” Myrick, 514 U.S. at 287, 115 S.Ct. 1483. At the same time, however, the Court acknowledged that prior case law. i'supports an inference that an express pre-emption clause forecloses implied pre-emption; [though] it does not establish a rule.” Id. at 289, 115 S.Ct. 1483; see also id. at 288, 115 S.Ct. 1483 ("The fact that an express definition of the pre-emptive reach of a statute 'implies' — i.e., supports a reasonable inference — that Congress did not intend to preempt other matters does not mean that the express clause entirely forecloses any possibility of implied preemption.”).

. Of course, any analysis of conflict preemption requires an inquiry into the dictates of the state law in question, for if state law does not prohibit a railroad from discharging storm water onto an adjoining land under the circumstances of this case, there is no conflict of law. Because the District Court did not evaluate the underlying merits of MD Mall’s storm water trespass or negligence claims, but rather avoided them on FRSA preemption grounds, on remand we will allow the District Court to have a first pass at those questions. Cf. Strozyk, 358 F.3d at 278 (reversing district court’s preemption holding and "leavfing] the issue of whether or not the railroad met its duty of care, and the relevant standard, for the District Court and the fact finder on remand”).
In addition, we will leave it to the District Court on remand to address, if necessary, CSX’s additional argument that MD Mall’s claims are preempted under the ICCTA, the Interstate Commerce Commission Termination Act.
Finally, given our invocation of the public importance exception to the waiver doctrine to allow MD Mall to press its new argument, MD Mall is estopped from arguing on remand that § 213.33 imposes a duty on CSX to prevent storm water discharge onto a neighboring property and that CSX failed to comply with the supposed standard of care created by that duty. Otherwise, we would be allowing MD Mall for the third time to ”assert[] a position inconsistent with one that [it] [had] previously asserted in ... a previous proceeding.” Macfarlan, 675 F.3d at 272 (internal quotation marks omitted).

. See, e.g., S.A. 98-99 (“Therefore, based upon the clarifying amendment, claims alleging that the railroad failed to comply with federal regulations are not preempted by the FRSA.”) (emphasis added), S.A. 110-13, S.A. 160-61, S.A. 165 ("We are suing under a state law that is identical to federal regulations, they both say the same thing ... thou shall maintain your water.”).